Filed 3/17/21  Cal. Dept. of State Hospitals at Coalinga v. T.F. CA5

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| CALIFORNIA DEPARTMENT OF STATE HOSPITALS AT COALINGA,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>T.F.,<br><br>Defendant and Appellant. | F080811<br><br>(Super. Ct. No. 19CRAD685205)<br><br>**OPINION** |

### THE COURT*

APPEAL from an order of the Superior Court of Fresno County.  Mark E. Cullers, Judge.

Rudy Kraft, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Cheryl L. Feiner, Assistant Attorney General, Gregory D. Brown and Jennevee H. de Guzman, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

\*       Before Peña, Acting P.J., Meehan, J. and Snauffer, J.

**INTRODUCTION**

Appellant T.F. is a person civilly committed under the Sexually Violent Predator Act (Welf. & Inst. Code, § 6600 et seq.).[1] He suffers from certain disorders, but his primary diagnosis is "schizoaffective disorder bipolar type."

On January 27, 2020, the superior court determined that appellant lacks capacity to refuse medical treatment. The court issued a written order that appellant could "be involuntarily administered antipsychotic medication by Department of State Hospitals in the dosage and for the frequency deemed necessary by Department of State Hospitals' clinical treatment staff for the period of time not to exceed one year from the date of the order."

Appellant argues that the court's order violates his federal constitutional rights to due process and equal protection. He further contends that the court used erroneous standards in issuing its order, and he asserts that substantial evidence does not support the court's ruling. We agree with respondent that appellant has forfeited his federal constitutional challenges, and we conclude that appellant does not establish ineffective assistance of counsel. We also determine that substantial evidence supports the order, which we affirm.

**BACKGROUND**

The hearing below was initiated with the government's petition seeking to administer antipsychotic medications to appellant against his will. As we explain in greater detail later in this opinion, California law permits the involuntary administration

---

[1] Under the Sexually Violent Predator Act (Welf. & Inst. Code, § 6600 et seq.), a convicted sex offender may be declared a sexually violent predator (SVP) and be civilly committed upon completion of the criminal sentence. (*People v. Superior Court* (*Troyer*) (2015) 240 Cal.App.4th 654, 657.) A petition to commit someone as an SVP requires two mental health evaluators to agree that the person in question is an SVP and is likely to engage in acts of sexual violence without appropriate treatment and custody. (*Ibid*; see also Welf. & Inst. Code, § 6601, subds. (d)–(i).)

of such drugs upon an SVP if a court determines that the person is either (1) incompetent to refuse the treatment; or (2) dangerous within the meaning of Welfare and Institutions Code section 5300.[2] (*In re Calhoun* (2004) 121 Cal.App.4th 1315, 1354; see also *In re Qawi* (2004) 32 Cal.4th 1, 9–10 [establishing that the government may involuntarily impose antipsychotic drugs upon a mentally disordered offender (MDO) utilizing the same criteria].)

The government's petition in this matter was filed under the authority of *In re Calhoun*. The parties and the trial court agreed to bifurcate the proceedings. During the first portion, only appellant's capacity would be addressed. However, as appellant notes in his opening brief, no further hearing occurred after the court ruled against appellant, and the issue of dangerousness was never reached.[3]

---

[2] Welfare and Institutions Code section 5300 is part of the Lanterman-Petris-Short Act. This section permits, after expiration of a "14-day period of intensive treatment," a person may be confined for further treatment (not to exceed 180 days) if one of the following exists:

"(1) The person has attempted, inflicted, or made a serious threat of substantial physical harm upon the person of another after having been taken into custody, and while in custody, for evaluation and treatment, and who, as a result of a mental health disorder, presents a demonstrated danger of inflicting substantial physical harm upon others.

"(2) The person had attempted, or inflicted physical harm upon the person of another, that act having resulted in the person being taken into custody and who presents, as a result of a mental health disorder, a demonstrated danger of inflicting substantial physical harm upon others.

"(3) The person had made a serious threat of substantial physical harm upon the person of another within seven days of being taken into custody, that threat having at least in part resulted in the person being taken into custody, and the person presents, as a result of a mental health disorder, a demonstrated danger of inflicting substantial physical harm upon others." (Welf & Inst. Code, § 5300, subd. (a)(1)–(3).)

[3] A finding of dangerousness was not necessary for the trial court to issue its order. Instead, appellant's lack of capacity was sufficient. (See *In re Calhoun*, *supra*, 121 Cal.App.4th at p. 1354.) Respondent asserts that the parties below "stipulated" that the "sole issue before the trial court was T.F.'s capacity to consent to medical treatment." Appellant objects to respondent classifying this as a stipulation. We need not resolve that

3.

## I.	The Testimony From The Psychiatrist.

The prosecution established that appellant is an SVP who is under the care and treatment of a psychiatrist.  Appellant is an adult patient at the state hospital in Coalinga.  His doctor, Johnny Chee, testified that appellant's primary diagnosis is schizoaffective disorder bipolar type.  Appellant's main symptoms (when he is off his medications) are mania, irritability, and delusions.  Appellant reports auditory hallucinations.  He also suffers from "antisocial personality disorder, other specified paraphilic disorder, cannabis use disorder, [and] hallucinogen disorder."

Chee testified that, when he first met appellant, appellant agreed at that time that he had a mental illness, and that he benefited from the medications.  More recently, however, appellant did not believe that he had a mental illness.  He had refused to take his medications for about one week, and he acquired a withdrawal symptom.  Several months after refusing to take his medications, appellant mentioned that he did have a mental illness, but he did not believe he had schizoaffective disorder.  During a more recent conversation with appellant, appellant said "he heard voices" all the time.  Appellant, however, objected to Chee's suggestion to use antipsychotics to treat his auditory hallucinations.  Chee believed that appellant was aware that he suffers from a psychiatric condition, but "I don't think he necessarily agrees with his clinical team or my view on what he has."

At the time of this testimony, appellant was taking lithium (450 milligrams a day) as a mood stabilizer; paroxetine (20 milligrams a day) as an antidepressant; and paliperidone (nine milligrams a day) as an antipsychotic.  Chee described these drugs as "a common combination for schizoaffective disorder."  He explained that lithium was started in the summer of 2019 "after a period of non-adherence to [appellant's] previous mood stabilizer Depakote because he also wanted to resume his antidepressant

---

dispute.  Instead, regardless of how the bifurcation occurred, it is undisputed that the trial court only considered appellant's capacity during this hearing.

4.

paroxetine." Chee explained that the risk of prescribing an antidepressant without a mood stabilizer "is bad and can sometimes result in mania in certain patients."

The benefit of lithium is to keep appellant's mood stable. In comparison to appellant's prior mood stabilizer, depakote, lithium would not result in weight gain, which was a concern that appellant had expressed when he was on depakote. The benefit of paroxetine is that it helps with depression or depressed mood. In the context of appellant's diagnosis, however, it could result in mania. The benefit of paliperidone is that it treats psychotic symptoms such as voices and delusions. The risk it carries "is things like acute dystonia, which is kind of a stiffening of the muscles; EPS, which is a long-term effect of antipsychotics where there is kind of cognitive limit; and a less consequential side effect" is a complaint of "sedation."

Chee testified that he had discussed the risks and benefits of these drugs with appellant as "best as I could." In Chee's opinion, appellant was unable to understand the benefits and risks of taking or not taking the psychotropic medications. Appellant was also not capable of understanding, participating and evaluating the information provided to him with respect to his mental condition and treatment options. Chee explained that appellant "has his opinion as to what the risks and benefits of his medications are and they do not necessarily coincide with what we or what I feel like he needs to be taking to maintain his stability." Chee noted that, when appellant had stopped taking his medications altogether for about one week, there were a greater number of "incident reports" involving appellant, and Chee had decided to start the involuntary medication process.

Chee informed the court that less intrusive methods for appellant were not available for a standard treatment of schizoaffective disorder. He further opined that appellant was unable to knowingly and intelligently give informed consent regarding his treatment. Chee stated it was his professional opinion that appellant should be administered psychotropic medication involuntarily if he refused to take the prescribed

medication.  The goal was to keep him "on the same scheduled medications that he has been on since before the start of his involuntary medication via hospital panel.  The goal is not to increase his medications or whatnot.  It is simply to make sure that he adheres to the medication . . . he has been on."  Chee testified that it was important to keep appellant on his medications because it is "the standard of treatment for his diagnosis and his mental illness and he has had a decrease in incidents since he began adhering to his medications again."

Chee agreed that appellant's current medication regimen was helping his psychiatric condition.  The contents of appellant's conversations (at least in the times he had agreed to see Chee or the team) "have been more reality based."  Reports of incidents involving appellant "have completely decreased or been gone for the last couple of weeks."  Before, appellant had suffered an increasing number of "significant incident reports against female staff.  He has been documented as being more focused on females when he is manic.  Since the start of the involuntary medication order by [the] hospital panel, those reports have been non-existent."  Regarding delusions, Chee could not opine whether those had lessened or not.  However, Chee had not heard anything "other than reality-based conversation coming from [appellant] in the last maybe one to two visits that I've seen him."  Chee agreed that it was accurate to say that appellant's mood was more stable, and his discussions reality-based, because of the medications.

## II.     Appellant's Testimony.

Appellant testified at the hearing.  He agreed that, in June 2019, he had stopped taking his medications for about nine days.  During a meeting with Chee, appellant had agreed to stop taking depakote and start a different mood stabilizer.  Chee had wanted him to take lithium, but appellant had reservations because he knew people who had developed tardive dyskinesia.  Appellant did not want that same outcome so he would not take lithium.  However, the next time he received his medications, they had been changed

to lithium and haloperidol without appellant's knowledge. That is why he refused to take them. According to appellant, he told Chee that he would take other medications, but Chee told him that those were the only two medications available. Chee started the involuntary medication process when appellant refused to take them.

Appellant was concerned that the medications would cause him "visual twitches" and other problems. He testified that, when considering whether or not to take prescribed medication, he would read "the nursing handbook" to see the side effects and any "counter-indicative" medications. He would also talk to other people, including a "dean and supervisor and a psychologist …."

Appellant stated that he went back on his medications to avoid problems with staff. According to him, when he is not on his medications "they think that I'm going to be a problem, so they make me a problem. They—they'll search my room five times a day, they'll bump into me, and, like, they'll create a problem."

On cross-examination, appellant identified his diagnosis as schizoaffective disorder but he was not sure that he had a mental illness. He did not believe he met the definition of that disorder because he was not "disorganized," "unclean," or "dirty." He said that disorder involved people who "talk to themselves and stumble around, and I'm not like that." He admitted that he suffers from auditory, visual and mental hallucinations. He said it was "irrelevant" to describe his hallucinations, but explained that he has a "collective consciousness" and he is "aware of things in the environment that aren't being observed" by others. He believes in God and he is "spiritual."

Appellant testified that he hears "what I expect are the thoughts of others, what is most likely—like I can intuit." He said he was very "intuitive" and he can "intuit things and my mind gives body to that. Like I'm able to get an audible voice in your presence, like, I—it isn't—I don't—like, what—like, it doesn't influence my capacity. In fact, it helps me."

7.

Appellant testified that he did not want to take depakote because of weight gain. He usually weighs 185 pounds but he now weighs 250, and the problem was getting worse. He decided to stay on depakote because the only alternative drugs were worse, but Chee "changed it anyway." He stated that he was currently taking paliperidone, which was an antipsychotic. He said Chee's testimony had already identified the risks of that drug. Appellant, however, claimed that the benefits were "illusional." He compared it to "drinking water" because it does not "do anything." Nevertheless, he would stay on that drug for the sake of the staff. He noted that his mood had been stable "for a long period of time" but he was not sure if that was attributable to lithium. However, he would prefer to be on a mood stabilizer other than lithium because he was "not willing to take the chance of tardive dyskinesia."

### III. The Trial Court's Ruling.

After hearing the testimony from Chee and appellant, the attorneys made relatively brief arguments. Counsel for respondent generally asserted that appellant did not have full awareness of his mental illness, and he was not able to participate in or make decisions about his treatment options. In contrast, appellant's counsel emphasized that appellant was aware that he suffered from a mental condition, and he understood the effect certain medications have on him. According to appellant's counsel, appellant wanted to continue certain medications and discontinue other medications. Appellant's counsel asserted that appellant takes "a lot of different factors into consideration in making his decision as to what meds he should be on and what meds he shouldn't." In reply, counsel for respondent asserted that appellant had denied having a mental illness. Appellant needed to take his medications consistently, and there was a risk he would stop whenever he disagreed with the medication regimen. Respondent asserted "it's pretty clear that he doesn't understand the risks and benefits of the medication."

The trial court stated that, although appellant is "generally aware" that he has a mental illness, "he's not acutely aware of his situation. He has a general understanding of the benefits and risks of some of the treatments but not all of the treatment, and he has a tendency to substitute his judgment for the judgment of the doctors when it's—he believes—well, whenever he believes it's beneficial to him." The court found by "clear and convincing evidence that [appellant is] not able to understand and knowingly and intelligently and rationally evaluate and participate in his treatment decision at this time." The court noted that appellant has the right as a patient to question the doctor's judgment. "However, when it gets to the point where the—it becomes either refusals or refusals to take certain medications where the health … of [appellant's health is] at stake and the health and safety of the public and those at the Department of State Hospitals [is] at stake, [appellant] has to yield."

The court found the involuntary treatment order to be appropriate. It issued a written order finding that appellant lacks capacity to refuse treatment. Appellant could be "involuntarily administered antipsychotic medication by Department of State Hospitals in the dosage and for the frequency deemed necessary by Department of State Hospitals' clinical treatment staff for the period of time not to exceed one year from the date of the order." The order was signed on January 27, 2020, and filed that same day.

## DISCUSSION

### I. Appellant Has Forfeited His Federal Constitutional Challenges And He Fails To Establish Ineffective Assistance Of Counsel.

The parties dispute numerous issues surrounding the trial court's order. According to appellant, the court violated his federal constitutional rights. He contends that the court failed to consider and apply the standards set forth in certain United States Supreme Court opinions, which deal with the circumstances under which medications may be involuntarily administered to prisoners.

9.

In contrast, respondent asserts (in part) that waiver occurred because appellant failed to raise any of the constitutional claims that he now advances. Respondent further contends that appellant's constitutional rights were not violated.

To overcome forfeiture (or waiver), appellant argues that any objection in the lower court based on the federal Constitution would have been futile. He also raises ineffective assistance of counsel.

We agree with respondent that appellant has forfeited his federal constitutional claims in failing to raise them below. Moreover, he does not demonstrate ineffective assistance of counsel.

## A.     Appellant has forfeited his federal constitutional challenges.

The term "forfeiture" is defined as the failure to make the timely assertion of a right. (*United States v. Olano* (1993) 507 U.S. 725, 733.) To avoid forfeiture, a party must call the trial court's attention to any infringement of rights or risk losing them.[4] (*People v. Saunders*, *supra*, 5 Cal.4th at p. 590 & fn. 6.) A failure to object in the trial court results in a forfeiture of those issues which are then raised on appeal. (*People v. Dykes* (2009) 46 Cal.4th 731, 756; see also *People v. Redd* (2010) 48 Cal.4th 691, 730 [failure to raise confrontation clause in the trial court forfeited the claim on appeal].)

Constitutional claims may be raised for the first time on appeal if the new arguments do not involve facts or legal standards different from what was raised below. (*People v. Tully* (2012) 54 Cal.4th 952, 979–980.) The new argument must assert " 'that the trial court's act or omission, insofar as wrong for the reasons actually presented to

---

[4]     The terms "waiver" and "forfeiture" are often used interchangeably. (*People v. Saunders* (1993) 5 Cal.4th 580, 590, fn. 6.) However, waiver is different from forfeiture. Forfeiture is the failure to make the timely assertion of a right. In contrast, waiver is the intentional relinquishment or abandonment of a known right. (*United States v. Olano*, *supra*, 507 U.S. at p. 733.) In this matter, respondent asserts that appellant has waived his federal constitutional claims. However, forfeiture appears to be the correct term in this situation.

that court, had the additional legal consequence of violating the Constitution.' [Citations.] However, '[a] party cannot argue the court erred in failing to conduct an analysis it was not asked to conduct.' [Citation.]" (*Id.* at p. 980.)

Appellant claims it would have been futile to raise his federal constitutional arguments below. According to him, the trial court would have merely followed the current California law. We find this argument unpersuasive. Instead, appellant was required to bring these issues to the court's attention or risk losing them. (*People v. Saunders*, *supra*, 5 Cal.4th at p. 590 & fn. 6.) His present constitutional challenges involve facts and legal standards that are different from what was argued below. In short, appellant cannot now contend that the court erred in failing to conduct an analysis it was not asked to perform. (*People v. Tully*, *supra*, 54 Cal.4th at p. 980.) Appellant's failure to raise these constitutional issues in the superior court has resulted in their forfeiture on appeal. (*People v. Redd*, *supra*, 48 Cal.4th at p. 730; *People v. Dykes*, *supra*, 46 Cal.4th at p. 756.) Furthermore, appellant does not demonstrate ineffective assistance of counsel.

**B.      Appellant does not demonstrate ineffective assistance of counsel.**

Under the federal and state Constitutions, a criminal defendant is entitled to the effective assistance of counsel. (U.S. Const., 6th Amend.; Cal. Const., art. I, § 15; *People v. Ledesma* (1987) 43 Cal.3d 171, 215.) To prevail on such a claim, a defendant must establish two criteria: (1) that counsel's performance fell below an objective standard of reasonable competence; and (2) that he was thereby prejudiced. (*Strickland v. Washington* (1984) 466 U.S. 668, 687–688.) The defendant has the burden of showing both deficient performance and resulting prejudice. (*People v. Lucas* (1995) 12 Cal.4th 415, 436.)

As an initial matter, respondent contends that appellant had no right to the effective assistance of counsel because this hearing was civil in nature. Appellant disputes that assertion, contending that the state appointed counsel for him so it is logical

11.

to assume competent representation was required. Appellant, however, admits that he has not found any published opinions which address and resolve an ineffective assistance of counsel claim in the context of an involuntary medication order for a civilly committed person.

We need not fully address the parties' dispute regarding whether or not appellant, as an SVP, enjoyed a federal constitutional right to the effective assistance of counsel during the hearing below. Instead, we will presume that such a right extended to him in this situation. With the presumption in mind, we summarize appellant's constitutional arguments before explaining why he does not demonstrate ineffective assistance of counsel.

### 1.      A summary of appellant's constitutional arguments.

Appellant concedes that, under certain circumstances, the government may involuntarily medicate a prisoner or person who is civilly committed. He asserts, however, that federal law requires a showing of medical appropriateness (and, perhaps, medical necessity). Because the trial court only focused on whether appellant lacked capacity, and the court never considered whether or not the proposed medications were medically appropriate, appellant contends that his federal due process rights were violated.

Appellant also maintains that California law treats him disparately as an SVP when compared to a defendant who is incompetent to stand trial. (See Pen. Code, § 1370, subd. (a)(2)(B)(i)(I).) He claims that a less stringent standard was used for his situation than those standards used to involuntarily medicate a defendant who lacks capacity to assist in his own criminal trial. He contends that no "compelling governmental interest" could exist for California to treat SVP's differently from persons not competent to stand trial. He argues we should reverse the trial court's order and remand this matter so the

12.

court can employ the proper federal standards in determining whether it is appropriate for the government to administer antipsychotic medications against his will.

## 2. A summary of the applicable federal law.

Appellant's federal constitutional challenges stem from three United States Supreme Court opinions. First, in *Washington v. Harper* (1990) 494 U.S. 210 (*Harper*), the Supreme Court held that convicted prisoners possess a significant liberty interest in avoiding the unwanted administration of antipsychotic drugs, and such drugs may be involuntarily administered only if the inmate is dangerous to himself or others, and the treatment is in the inmate's medical interest. (*Id.* at p. 227.)

Second, in *Riggins v. Nevada* (1992) 504 U.S. 127 (*Riggins*), the Supreme Court applied *Harper* to a criminal defendant facing trial. The *Riggins* court reversed a murder conviction after concluding (1) there was an insufficient factual showing to support the involuntary medication order; and (2) the defendant was likely prejudiced at trial because the antipsychotic drugs had an adverse effect on his demeanor and ability to testify. (*Id.* at pp. 137–138.)

Finally, in *Sell v. United States* (2003) 539 U.S. 166 (*Sell*), the Supreme Court held that, following *Harper* and *Riggins*, the federal Constitution permits the government to administer antipsychotic drugs involuntarily "to a mentally ill defendant facing serious criminal charges in order to render that defendant competent to stand trial, but only if the treatment is medically appropriate, is substantially unlikely to have side effects that may undermine the fairness of the trial, and, taking account of less intrusive alternatives, is necessary significantly to further important governmental trial-related interests." (*Sell*, *supra*, 539 U.S. at p. 179.) The court acknowledged that the question of involuntary medication to restore an accused's ability to stand trial is different from involuntarily medicating an inmate who is dangerous to himself or others when the refusal to take the medication puts his health gravely at risk. (*Id.* at pp. 181–182.)

13.

### 3. A summary of the applicable California law regarding the forced administration of antipsychotic drugs upon a criminal defendant.

Following *Sell*, the California Legislature amended Penal Code section 1370[5] to comply with federal due process requirements. (*People v. O'Dell* (2005) 126 Cal.App.4th 562, 569.) The Legislature added subdivisions governing the administration of antipsychotic medication. (*People v. Lameed* (2016) 247 Cal.App.4th 381, 396.)

The Penal Code now directs a trial court to "hear and determine" whether a criminal defendant lacks capacity to make decisions regarding the administration of antipsychotic medication. (Pen. Code, § 1370, subd. (a)(2)(B).) A court must determine if any one of the following three sets of conditions or criteria are true. (Pen. Code, § 1370, subd. (a)(2)(B)(i).)

The first possible condition or criteria is as follows: The defendant lacks capacity to make decisions regarding antipsychotic medication; the defendant's mental disorder requires medical treatment with antipsychotic medication; and, if the defendant's mental disorder is not treated with antipsychotic medication, is it probable that serious harm to the physical or mental health of the defendant will result.[6] (Pen. Code, § 1370, subd. (a)(2)(B)(i)(I).)

The second possible condition or criteria is as follows: The defendant is a danger to others.[7] (Pen. Code, § 1370, subd. (a)(2)(B)(i)(II).)

---

[5] Penal Code section 1370 deals with criminal defendants who lack competency.

[6] "Probability of serious harm to the physical or mental health of the defendant requires evidence that the defendant is presently suffering adverse effects to his or her physical or mental health, or the defendant has previously suffered these effects as a result of a mental disorder and his or her condition is substantially deteriorating. The fact that a defendant has a diagnosis of a mental disorder does not alone establish probability of serious harm to the physical or mental health of the defendant." (Pen. Code, § 1370, subd. (a)(2)(B)(i)(I).)

[7] The statute explains that this means the "defendant has inflicted, attempted to inflict, or made a serious threat of inflicting substantial physical harm on another while in custody, or the defendant had inflicted, attempted to inflict, or made a serious threat of

14.

The final possible condition or criteria is as follows: "The people have charged the defendant with a serious crime against the person or property, involuntary administration of antipsychotic medication is substantially likely to render the defendant competent to stand trial, the medication is unlikely to have side effects that interfere with the defendant's ability to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a reasonable manner, less intrusive treatments are unlikely to have substantially the same results, and antipsychotic medication is in the patient's best medical interest in light of his or her medical condition." (Pen. Code, § 1370, subd. (a)(2)(B)(i)(III).)

Appellant acknowledges that California law follows the federal due process standards from *Sell*, *Riggins* and *Harper* when it comes to involuntarily administering antipsychotic medications to an accused person found mentally incompetent to assist in his or her own trial. He argues, however, that California law, at least regarding the involuntary administration of antipsychotic medications to an SVP, is at odds with those federal requirements. To understand appellant's assertions, we summarize the California law regarding the involuntary administration of antipsychotic medications to an SVP.

### 4. A summary of the applicable California law regarding the forced administration of antipsychotic drugs upon an SVP.

Welfare and Institutions Code section 6600 et seq. sets forth authority for civilly committing a person designated as an SVP after they have completed a criminal sentence. (*State Dept. of State Hospitals v. J.W.* (2018) 31 Cal.App.5th 334, 341.) Under the

---

inflicting substantial physical harm on another that resulted in his or her being taken into custody, and the defendant presents, as a result of mental disorder or mental defect, a demonstrated danger of inflicting substantial physical harm on others. Demonstrated danger may be based on an assessment of the defendant's present mental condition, including a consideration of past behavior of the defendant within six years prior to the time the defendant last attempted to inflict, inflicted, or threatened to inflict substantial physical harm on another, and other relevant evidence." (Pen. Code, § 1370, subd. (a)(2)(B)(i)(II).)

statutory scheme, an SVP is "a person who has been convicted of a sexually violent offense against one or more victims and who has a diagnosed mental disorder that makes the person a danger to the health and safety of others in that it is likely that he or she will engage in sexually violent criminal behavior." (Welf. & Inst. Code, § 6600, subd. (a)(1).) In this context, a diagnosed mental disorder "includes a congenital or acquired condition affecting the emotional or volitional capacity that predisposes the person to the commission of criminal sexual acts in a degree constituting the person a menace to the health and safety of others." (*Id.* at subd. (c).) It must be found beyond a reasonable doubt that the person qualifies as an SVP. (Welf. & Inst. Code, §§ 6603, subd. (f), 6604.) If this standard is not met, the person shall be released at the end of their original sentence or period of parole. If it is met, the person is then "committed for an indeterminate term to the custody of the State Department of State Hospitals for appropriate treatment and confinement."[8] (Welf. & Inst. Code, § 6604.)

Under California law, a competent adult has a common law and constitutional right to refuse medical treatment, including the administration of antipsychotic drugs. (*In re Qawi*, *supra*, 32 Cal.4th at p. 14.) Relatedly, "nonprisoners in California have a statutory right to refuse long-term treatment with psychotropic drugs absent a judicial determination that they are incompetent to do so." (*Keyhea v. Rushen* (1986) 178 Cal.App.3d 526, 541.) However, an involuntarily committed patient may be forcibly

---

[8] Respondent asserts that appellant's treatment plan "had already been decided at the time he was committed to the state hospital for treatment." According to respondent, due process did not "*once again*" require the lower court to make this determination. Appellant objects to these assertions, claiming no such determination ever occurred when he was first hospitalized. We agree with appellant in this regard. Respondent fails to cite to the record establishing that appellant's current treatment plan had already been decided when he was committed to the state hospital for treatment. Welfare and Institutions Code section 6606 merely requires the State Department of State Hospitals to provide "programming" to an SVP "which shall afford the person with treatment for his or her diagnosed mental disorder." (Welf. & Inst. Code, § 6606, subd. (a).)

16.

treated with antipsychotic medication if a court has determined that he is not competent to refuse treatment. (*In re Qawi*, *supra*, 32 Cal.4th at p. 14; *In re Calhoun*, *supra*, 121 Cal.App.4th at p. 1354.) "The right to refuse medication may be limited by countervailing state interests such as caring for persons who are unable to care for themselves and 'institutional security.' [Citation.]" (*In re Greenshields* (2014) 227 Cal.App.4th 1284, 1289.)

In *In re Qawi*, our high court analyzed whether a mentally disordered offender under the Mentally Disordered Offender Act (MDO Act)[9] has the right under statutory law to refuse antipsychotic medication prescribed for his mental disorder in the absence of a judicial determination of his incapacity to make such a decision. (*In re Qawi*, *supra*, 32 Cal.4th at p. 9.) The Supreme Court held that "an MDO can be compelled to take antipsychotic medication in a nonemergency situation only if a court, at the time the MDO is committed or recommitted, or in a separate proceeding, makes one of two findings: (1) that the MDO is incompetent or incapable of making decisions about his medical treatment; *or* (2) that the MDO is dangerous within the meaning of Welfare and Institutions Code section 5300." (*In re Qawi*, *supra*, 32 Cal.4th at pp. 9–10.) In addition, "[t]he rights of MDO's to refuse medication can be further limited by State Department of Mental Health regulations necessary to provide security for inpatient facilities." (*Id.* at p. 10.)

Following *In re Qawi*, the Court of Appeal expanded this law to an SVP. An SVP may refuse antipsychotic medication unless a court determines the person is (1) incompetent to refuse the treatment; or (2) dangerous within the meaning of Welfare

---

[9] The MDO Act requires "that offenders who have been convicted of violent crimes related to their mental disorders, and who continue to pose a danger to society, receive mental health treatment during and after the termination of their parole until their mental disorder can be kept in remission." (*In re Qawi*, *supra*, 32 Cal.4th at p. 9.)

and Institutions Code section 5300.[10] (*In re Calhoun*, *supra*, 121 Cal.App.4th at p. 1354.) It was *In re Calhoun* which served as the legal basis for the government's petition in this matter.

### 5. Appellant does not establish that his counsel had no rational tactical purpose for the alleged omissions and appellant does not show prejudice.

In ruling on a claim of ineffective assistance of counsel, we are to defer to counsel's reasonable tactical decisions, and there is a strong presumption that counsel's conduct falls within the range of reasonable professional assistance. (*People v. Lucas*, *supra*, 12 Cal.4th at pp. 436–437.) An appellate court will reverse the conviction "only if the record on appeal affirmatively discloses that counsel had no rational tactical purpose for his act or omission." (*People v. Fosselman* (1983) 33 Cal.3d 572, 581.) In conducting this review, the appellate court considers whether the record contains any explanation for counsel's actions; if the record sheds no light on counsel's actions, the claim is not cognizable unless counsel was asked for an explanation and failed to provide one, or unless there could be no satisfactory explanation for the actions taken. (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266; *People v. Kelly* (1992) 1 Cal.4th 495, 520.)

In this matter, this ineffective assistance claim is not cognizable on appeal because appellant's counsel was not asked for an explanation regarding his alleged failure to raise federal constitutional standards, and we cannot state that there can be no satisfactory explanation for the actions taken. Instead, appellant's counsel clearly attempted to establish that appellant had capacity to refuse the medications. Appellant testified and explained why he refused his treatment. During closing argument, appellant's counsel emphasized that appellant was aware that he suffered from a mental condition, and he

---

**10** In *In re Greenshields*, the same court that decided *In re Calhoun* held that persons who are found not guilty by reason of insanity have the same constitutional right as MDO's and SVP's to refuse antipsychotic medication. (*In re Greenshields*, *supra*, 227 Cal.App.4th at p. 1287.)

18.

understood the effect certain medications have on him. According to appellant's counsel, appellant wanted to continue certain medications and discontinue other medications. Appellant's counsel asserted that appellant takes "a lot of different factors into consideration in making his decision as to what meds he should be on and what meds he shouldn't."

Appellant claims that his trial counsel "could have had no tactical reason for failing to raise the two constitutional arguments." We disagree. It is possible that a reasonable attorney would have focused on the issue of capacity, and elected not to raise federal constitutional arguments, in attempting to defeat the government's petition during this initial bifurcated proceeding. Thus, it appears counsel made a reasonable tactical decision, which we will not second-guess on appeal. (See *People v. Kelly*, *supra*, 1 Cal.4th at p. 520.) Consequently, appellant fails to establish that his counsel's performance fell below an objective standard of reasonable competence. In any event, even if his counsel failed to act reasonably, appellant also fails to establish prejudice.

To show prejudice, a defendant must demonstrate that there is a reasonable probability the result of the proceeding would have been different in the absence of counsel's alleged errors. (*People v. Majors* (1998) 18 Cal.4th 385, 403.) "A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Ibid.*)

Here, Chee's testimony established that appellant requires antipsychotic medication. Appellant's drug regimen was "a common combination for schizoaffective disorder." Chee opined that less intrusive methods are not available.

Chee made it clear that, when appellant was not using his antipsychotic medication, he suffers serious harm to his mental health, which abates when he was on his recommended regimen. During a more recent conversation with appellant, appellant had said "he heard voices all the time" but objected to Chee's suggestions for the use of antipsychotics to treat his auditory hallucinations. Chee noted that, when appellant had stopped taking his medications altogether for about one week, there were a greater

19.

number of "incident reports" involving appellant, and Chee had decided to start the involuntary medication process. Chee testified that it was important to keep appellant on his medications because it is "the standard of treatment for his diagnosis and his mental illness and he has had a decrease in incidents since he began adhering to his medications again." Chee's testimony amply demonstrated that the antipsychotic medication was medically appropriate for appellant, if not necessary.

Appellant claims that "the government was required by the federal constitution to prove medical necessity in order to involuntarily medicate him." Regarding forfeiture (or waiver), he asserts that his silence could not result in losing this right, which he equates as a required element for the government to prove. We reject this assertion.

The three federal cases upon which appellant relies, *Sell*, *Riggins*, and *Harper*, did not address the circumstances upon which a *civilly* committed patient may be involuntarily administered antipsychotic drugs. Indeed, the *Sell* court noted that "courts typically address involuntary medical treatment as a civil matter, and justify it on these alternative, *Harper*-type grounds. Every State provides avenues through which, for example, a doctor or institution can seek appointment of a guardian with the power to make a decision authorizing medication—when in the best interests of a patient who lacks the mental competence to make such a decision."[11] (*Sell*, *supra*, 539 U.S. at p. 182.)

Although we have reservations regarding whether appellant is correct that the requirements in *Sell*, *Riggins*, and *Harper* apply to an SVP, we need not fully analyze the merits of his assertion. Instead, in light of this record, it is not reasonably probable the trial court would have denied the government's petition even if appellant's counsel had raised the federal constitutional arguments which he now advances in this appeal. Our

---

[11]   The *Sell* court also noted that, in civil proceedings, a court may authorize involuntary medication "where the patient's failure to accept treatment threatens injury to the patient or others." (*Sell*, *supra*, 539 U.S. at p. 182.)

confidence in the outcome of this matter is not undermined. As such, ineffective assistance of counsel is not present, and appellant's claims must fail. His federal constitutional challenges, which he failed to raise below, are deemed forfeited.

## II.     Substantial Evidence Supports The Trial Court's Order.

Appellant contends that the trial court imposed the wrong standards in issuing its order, and he asserts that substantial evidence does not support it.

### A.     Standard of review.

An appellate court reviews an order authorizing involuntary administration of antipsychotic medication for substantial evidence. (*State Dept. of State Hospitals v. J.W.*, *supra*, 31 Cal.App.5th at p. 344.) Such evidence must be reasonable, credible and of solid value. We cannot reverse the judgment merely because the evidence could be reconciled with a contrary finding. (*People v. D'Arcy* (2010) 48 Cal.4th 257, 293.)

### B.     Analysis.

When ruling in this matter, the trial court stated it did not know if appellant was reading some medical literature when questioning Chee's judgment. The court said it was appellant's right to do that as a patient, but the court expressed the following concern: "However, when it gets to the point where the—it becomes either refusals or refusals to take certain medications where the health … of [appellant's health is] at stake and the health and safety of the public and those at the Department of State Hospitals [is] at stake, [appellant] has to yield."

Appellant asserts that the trial court ordered him involuntarily medicated "simply because he chose not to agree to the medications his doctors wished him to take." He contends that his "alleged dangerousness" was not at issue during this bifurcated proceeding, and he argues that the court's "concern about the safety of the hospital was completely irrelevant." He claims that the court's analysis was flawed because it assumed that he lacked capacity merely because he chose to weigh the dangers of the side

21.

effects against the benefits of the medications, only to reach a different conclusion from the doctor. He maintains that the court implicitly determined that a "mere refusal to go along with the medical recommendations of the treating psychiatrist proves the existence of a lack of capacity." Finally, appellant asserts that the trial court failed to consider the required factors necessary to find a lack of capacity.[12] He contends that nothing shows his refusal was delusional. He argues that the trial court "simply rubber stamped" the hospital's decision to involuntarily medicate him.

We disagree with appellant's numerous arguments. "A judicial determination of competency to refuse treatment involves consideration of three factors: (1) whether the patient is aware of his situation and acknowledges the existence of his condition; (2) whether the patient understands the benefits and risks of treatment, as well as alternatives to treatment; and (3) whether the patient is able to understand and evaluate the information required to be given to patients whose informed consent is sought and participate in the treatment decision by rational thought processes."[13] (*State Dept. of State Hospitals v. J.W.*, *supra*, 31 Cal.App.5th at p. 344, citing *Riese v. St. Mary's Hospital & Medical Center*, *supra*, 209 Cal.App.3d 1303, 1322–1323.)

A superior court must use a "clear and convincing" evidentiary standard to determine if a committed patient is competent to refuse treatment. (*State Dept. of State Hospitals v. J.W.*, *supra*, 31 Cal.App.5th at p. 343.) Under this standard, the evidence must be "so clear as to leave no substantial doubt, [and] sufficiently strong to command

---

**12** Appellant, however, concedes that, in this context, there is "no clear definition" of how capacity or competency is defined under California case law.

**13** At least one appellate court has concluded that, with respect to the last consideration, it should be assumed that the patient is using rational modes of thought unless a clear link is shown between his or her delusional or hallucinatory perceptions and the ultimate decision regarding medical treatment. (*Riese v. St. Mary's Hospital & Medical Center* (1987) 209 Cal.App.3d 1303, 1323.)

the unhesitating assent of every reasonable mind." (*Conservatorship of Waltz* (1986) 180 Cal.App.3d 722, 733, fn. 14.)

We reject appellant's claim that the court found a lack of capacity merely because appellant had disagreed with his medical team. The court determined that appellant is "generally aware" that he has a mental illness, but "he's not acutely aware of his situation. He has a general understanding of the benefits and risks of some of the treatments but not all of the treatment, and he has a tendency to substitute his judgment for the judgment of the doctors when it's—he believes—well, whenever he believes it's beneficial to him." The court found by "clear and convincing evidence that [appellant is] not able to understand and knowingly and intelligently and rationally evaluate and participate in his treatment decision at this time."

Although the court did not articulate the three factors outlined in case law to determine appellant's competency, substantial evidence supports the court's ruling. Chee testified that appellant had recently expressed disbelief that he had a mental illness. During a more recent conversation with him, appellant said "he heard voices all the time" but objected to Chee's suggestion for the use of antipsychotics to treat his auditory hallucinations. Chee thought appellant was aware he had a psychiatric condition, but appellant did not necessarily agree with the clinical team.

Chee testified that he had discussed the risks and benefits of the drugs with appellant as "best as I could." In Chee's opinion, appellant was unable to understand the benefits and risks of taking or not taking the psychotropic medications. Appellant was also not capable of understanding, participating and evaluating the information provided to him with respect to his mental condition and treatment options. Chee explained that appellant "has his opinion as to what the risks and benefits of his medications are and they do not necessarily coincide with what we or what I feel like he needs to be taking to maintain his stability." Chee noted that, when appellant had stopped taking his medications altogether for about one week, there were a greater number of "incident

23.

reports" involving appellant, and Chee had decided to start the involuntary medication process.

Chee informed the court that less intrusive methods were not available for a standard treatment of schizoaffective disorder. He further opined that appellant was unable to knowingly and intelligently give informed consent regarding his treatment. Chee stated it was his professional opinion that appellant should be administered psychotropic medication involuntarily if he refused to take the prescribed medication. The goal was to keep him "on the same scheduled medications that he has been on since before the start of his involuntary medication via hospital panel. The goal is not to increase his medications or whatnot. It is simply to make sure that he adheres to the medication . . . he has been on." Chee testified that it was important to keep appellant on his medications because it is "the standard of treatment for his diagnosis and his mental illness and he has had a decrease in incidents since he began adhering to his medications again."

Finally, appellant told the court that the benefits of paliperidone, an antipsychotic, were "illusional." He compared it to "drinking water" because it does not "do anything."

The evidence from the hearing, and especially from Chee's testimony, represented substantial evidence supporting the three factors necessary for the trial court to have ruled that appellant lacked capacity. The evidence established that (1) appellant was not aware of his situation and he did not acknowledge his condition; (2) he did not understand the benefits and risks of treatment, as well as alternatives to treatment; and (3) he did not understand and could not evaluate the information, and he could not participate in the treatment decision by rational thought processes. (See *State Dept. of State Hospitals v. J.W.*, *supra*, 31 Cal.App.5th at pp. 343–344.)

Appellant contends that Chee never connected his refusal to take the medications to any "delusional beliefs." According to appellant, he refused the medication because he wanted to avoid the side effects. He concedes that some of his testimony contains

material "that can be viewed as delusional," but he argues that it was not delusion for him to want to avoid unpleasant side effects. He maintains that he did recognize that he suffers from a mental illness, and he recognized "at least some symptoms of his mental illness and knows the side effects of the medicines the doctors want him to take." He argues that, if he is not allowed to refuse these medications, then the "entire process" underlying these hearings "becomes a fraud."

Appellant further notes that, given the state of the evidence, the trial court could have decided to deny the government's petition. He contends that the court could have determined that he "was making a knowing and intelligent evaluation of the information about the medication to reach a conclusion that while, perhaps, suboptimal, was not indicative of a lack of capacity to make a decision." Appellant asserts that he "offered a rational explanation for his short term decision to stop taking medications completely."

We decline appellant's invitation to second-guess how the trial court should have viewed the testimony. Although Chee never expressly opined whether or not appellant's delusional or hallucinatory perceptions were linked to his ultimate decision regarding medical care, the totality of this record demonstrates that appellant was not capable of evaluating the information provided to him, or understanding and participating regarding his mental condition and treatment options. Moreover, when searching for substantial evidence, we will neither reweigh the evidence nor reevaluate witness credibility. We cannot reverse the court's order merely because the evidence could be reconciled with a contrary finding. (See *People v. D'Arcy*, *supra*, 48 Cal.4th at p. 293 [applying that standard for a judgment].) The court clearly found Chee's testimony credible, and it rejected appellant's testimony. We will not disturb how the court weighed the evidence or the credibility of the two witnesses.

Based on this record, the trial court's ruling had evidentiary support that was reasonable, credible and of solid value. A reasonable fact finder could have concluded based on clear and convincing evidence that appellant lacked capacity to refuse the

administration of antipsychotic drugs.  As such, substantial evidence appears in this record.  Accordingly, we will not reverse the court's order, and appellant's various assertions are without merit.

## DISPOSITION

The court's order appealed from is affirmed.