[No. D001966. Fourth Dist., Div. One. May 2, 1986.]

Conservatorship of the Person of JOHN WALTZ.
SAN DIEGO DEPARTMENT OF SOCIAL SERVICES,
Petitioner and Respondent, v.
JOHN WALTZ, Objector and Appellant.

**[Opinion certified for partial publication.[1]]**

---

[1]Certified for publication with the exception of sections I through IV.

**COUNSEL**

Sharron Voorhees for Objector and Appellant.

Lloyd M. Harmon, Jr., County Counsel, Daniel J. Wallace, Chief Deputy County Counsel, and Thomas E. Montgomery, Deputy County Counsel, for Petitioner and Respondent.

**OPINION**

**WORK, J.**—A conservator was appointed (Welf. & Inst. Code,[2] § 5350) when John Waltz was found to be incapable of providing for his basic personal needs. He was also found incapable of consenting to or refusing electroconvulsive therapy (ECT) and his conservator was given the power to consent or refuse this shock treatment on his behalf. (§ 5326.7, subds. (f) & (g).)

Waltz contends expert medical evidence was improperly admitted at the conservator hearing; the ECT hearings were untimely; the county counsel improperly participated in the ECT hearings; and the court made erroneous orders at the ECT hearings. These contentions do not establish reversible error.[3]

However, the judgments establishing Waltz's inability to give informed consent to ECT are not supported by substantial evidence, and we reverse them.

STATEMENT OF FACTS

John Waltz has a long history of mental illness. His behavior had been relatively stable while taking lithium, and he had been living at Holly Center,

---

[2] All statutory references are to the Welfare and Institutions Code unless otherwise specified.

[3] County counsel was attorney for respondent, William G. Miller, but only briefed the issue pertaining to the conservator hearing, since he was not officially operating as counsel at the ECT hearings. The ECT petitioner, Dr. David Borman, was also served with the notice of appeal and other documents, but did not file a respondent's brief. We examine the record on the basis of appellant's brief as to the ECT issues and reverse only if prejudicial error is found. (*Votaw Precision Tool Co.* v. *Air Canada* (1976) 60 Cal.App.3d 52, 55 [131 Cal.Rptr. 335], and cases cited therein.)

a board and care home for the mentally disabled. However, after signs of kidney injury this medication was discontinued, he became severely psychotic and was hospitalized at Mesa Vista Hospital where he was diagnosed by Dr. David Borman as having "schizoaffective illness, excited phase."

On June 19, 1984, Dr. Borman filed a "Petition for Determination of Involuntary Patient to Give Informed Consent to Convulsive Treatment" (§ 5326.7, subd. (f)), to determine whether Waltz was incapable of consenting to or refusing electroconvulsive therapy. An ECT hearing was held on June 21 and the court found Waltz was not capable of giving consent or refusal, but continued the hearing to June 25. On June 25, the court found as follows: "Treatments to be given. Treatments are not to exceed 3 treatments per week over a 30-day period. No one appointed at this time to give written consent." On July 2, 1984, Borman filed a second ECT petition and, on July 9, the court again found Waltz incapable of giving consent or refusal, appointed the county mental health counselor, William Miller, as temporary conservator with the power to consent or refuse, and ordered "no more than 3 or 4 treatments per week; and they will not extend over a period of 30 days." The court also ordered the conservator, in deciding whether or not to give consent to ECT, to consider the fact that on July 19, a jury trial was to be held to determine whether a permanent conservatorship should be appointed, and the ECT should not be allowed to interfere with Waltz's ability to testify.

On July 13 and 20, Waltz received ECT, one treatment on each day.

On July 5, William Miller, represented by the office of county counsel, filed a "Petition for Appointment of Conservator of Person" under section 5350 and was appointed temporary conservator ex parte. Waltz filed an amended response, in which he admitted having a mental disorder, but denied he was gravely disabled by reason of the disorder. On July 25 and 26, a jury found Waltz was gravely disabled and the court appointed the public conservator.

On August 9, Dr. Borman filed yet another ECT petition. The court found Waltz did not have the capacity to give or refuse consent to electroconvulsive treatment, and that Waltz's conservator could give any necessary written informed consent.[4]

---

[4]Waltz's brief on appeal indicates he is now at a board and care facility.

I-IV*

. . . . . . . . . . . . . . . . . . . . . . . . . .

V

## A Finding of Inability to Give Informed Consent Based on Psychotic Fear Reactions to Discussion of ECT Is Erroneous if a Rational Fear and Refusal of ECT Is Reiterated During Nonpsychotic Moments

■ On appeal, Waltz does not challenge the substance of the trial court's determinations he was unable to give informed consent. Although it "is not our function to search an appellate record for error, but, particularly in a case involving a citizen's personal freedom, we are 'at liberty to consider, and even to decide, a case upon any points that its proper disposition may seem to require whether taken by counsel or not.'" (*People* v. *Wilson* (1968) 258 Cal.App.2d 578, 585 [65 Cal.Rptr. 839]; instructional error required reversal of order of involuntary commitment for narcotics addiction.) Thus, we have the power to resolve issues not raised when we are faced with glaring error and seek to avoid grave injustice.[9]

In *Conservatorship of Fadley* (1984) 159 Cal.App.3d 440, 446-447 [205 Cal.Rptr. 572], the court established certain principles to guide the trial court in a section 5326.7, subdivision (f) evidentiary hearing on informed ECT consent. The issue before the trial court is a narrow one: Is the patient able to give informed consent? The issue is not whether ECT is definitely needed, or is the least drastic alternative available; these are purely medical determinations.

■ *Fadley* states the trial court is limited to considering the medical evidence regarding the patient's condition and prognosis to assist in its assessment of the patient's ability to consent. If, as in *Fadley*, the evidence suggests the patient's health would be greatly jeopardized without the therapy, and the patient shows absolutely no appreciation of the gravity of his situation, an inference can be drawn the patient understands neither his illness nor the need for treatment.

---

*See footnote 1, *ante*, page 722.

[9]Ordinarily, the affected parties would be notified and permitted to brief issues which were not previously briefed. However, Dr. Borman failed to file a responding brief and we have proceeded under California Rules of Court, rule 17(b).

 Here at two ECT hearings, Dr. Borman testified that after Waltz's lithium medication was discontinued, he became severely psychotic, a condition which included feelings of persecutory dread. Dr. Borman explained his psychosis was intermittent, occurring every other day, or during portions of every day.

One of the stimuli which sent Waltz into a psychotic state was discussion of ECT. For about three or four weeks he would not listen to an explanation of the therapy, but finally Borman was able to have him sit quietly and listen. Borman was able to explain in detail, fully and completely, the information on the consent form.[10]

In reaction to Borman's explanations, Waltz told Borman ECT will harm his brain and probably kill him, he did not want to discuss it further and did not want shock treatment, he had confidence his current medication would heal him, he did not want to hear the explanation, and said over and over, "I don't want it. It will kill me and scramble my brain. I don't want it."

Borman concluded Waltz's condition rendered him unable to give informed consent, since he was so anxious at the time ECT was discussed that he could not receive simple information, and Borman did not know whether Waltz understood the side effects explained to him.

At the ECT hearings, Waltz testified he did not want ECT because he had it before, it was a horrible experience, made him unconscious and walk around in a daze for days, made him forgetful, and caused other side effects. He remembered talking to Dr. Borman about ECT, and when asked if he was afraid of it and wanted to avoid such possible side effects as lung, brain or heart problems, and even death, he answered affirmatively. He testified he believed his medications brought him back to reality, not ECT.

Dr. Borman testified the only progress Waltz had made in 70 days of hospitalization was he knew how to request help by asking to be brought to a seclusion area when he needed to be away from people. At the July 9 ECT hearing, the court concluded: "Mr. Waltz, you do present a perplexing

---

[10]Borman explained the possible side effects of ECT were headache; nausea; sore muscles; confusion; short and long-term memory loss; minor dental problems; serious complications of heart, lung, or brain functioning; and, death.

portrait of a condition have [*sic*] you have; but based on the competent psychiatric testimony before me and the concurring opinions of the physicians who have treated you, I find that you don't have the ability to give informed consent for electroconvulsive therapy treatment at this time."

At the August 13 hearing, the court asked Dr. Borman if Waltz's life was in danger if he did not undergo ECT, and Borman answered "yes," since Waltz had told others he was prepared to do something that would make him well or put an end to it; Borman believed he would either starve or do something like jump into bodies of water, pursue his psychotic world, and come to harm sooner rather than later.[11]

The court stated: "It seems to me if a patient is faced with a choice between taking a treatment which will save that patient's life or losing the patient's life, that's a vastly different situation than a patient who has an option of having convulsive treatment that may help them make them better or hasten their getting well versus not, and it seems to me that's what I have to weigh," and concluded Waltz was incapable of giving informed consent.

In sum, if the evidence is viewed most favorably to the prevailing party, and all contradictions are disregarded, we have the following record of Waltz's state of mind: Waltz was extremely psychotic, with delusional fears; his psychotic state of mind was intermittent; he could be calm and aware of his illness at one moment, and agitated, aggressive, and delusional the next; he had made some progress at the hospital in that he could ask to be placed in seclusion when needed, but his psychotic episodes had not diminished; he understood ECT was recommended to help him; its effects were fully explained to him, and he believed it would scramble his brain and would kill him: he became agitated and then psychotic when the doctors attempted to discuss ECT with him and frequently would not listen to their explanations; when he testified at the hearing regarding his refusal to consent to ECT, he testified in a responsive manner, was able to follow a logical sequence of questions and answers, and evinced a coherent train of thought, which indicates he was capable of rational thought; he testified he had ECT before, was afraid of it because he might die from it and it causes forgetfulness, and he believed the medications would make him better.

---

[11]When stating Waltz would starve, Borman was apparently referring to the occasions when Waltz had difficulty eating, and had to be reminded and encouraged to do so by staff; evidence which was presented during the conservator hearing.

We cannot find any substantial evidence in the record that Waltz would die if not administered ECT. At most, the evidence indicates Waltz's life might be in danger were he not hospitalized.

██ Section 5326.5, subdivision (c) defines incapacity to give consent as being unable to understand, or knowingly and intelligently act upon, the information in section 5326.2. ██ ██ Section 5326.5, subdivision (d) states a finding of incapacity shall not be based solely on the fact of being diagnosed as mentally ill.[12] ██ Section 5326.2 states: "To constitute voluntary informed consent, the following information shall be given to the patient in a clear and explicit manner:

"(a) The reason for treatment, that is, the nature and seriousness of the patient's illness, disorder or defect.

"(b) The nature of the procedures to be used in the proposed treatment, including its probable frequency and duration.

"(c) The probable degree and duration (temporary or permanent) of improvement or remission, expected with or without such treatment.

"(d) The nature, degree, duration, and probability of the side effects and significant risks, commonly known by the medical profession, of such treatment, including its adjuvants, especially noting the degree and duration of memory loss (including its irreversibility) and how and to what extent they may be controlled, if at all.

"(e) That there exists a division of opinion as to the efficacy of the proposed treatment, why and how it works and its commonly known risks and side effects.

"(f) The reasonable alternative treatments, and why the physician is recommending this particular treatment.

---

[12]Section 5326.5, subdivision (c) states: "A person confined shall be deemed incapable of written informed consent if such person cannot understand, or knowingly and intelligently act upon, the information specified in section 5326.2."

Section 5326.5, subdivision (d) states: "A person confined shall not be deemed incapable of refusal solely by virtue of being diagnosed as a mentally ill, disordered, abnormal, or mentally defective person."

"(g) That the patient has the right to accept or refuse the proposed treatment, and that if he or she consents, has the right to revoke his or her consent for any reason, at any time prior to or between treatments."

During Waltz's nonpsychotic moments he knows (a) he is mentally ill; (b) what ECT is; (c) the doctors think it will help him; (d) it can cause memory loss and possibly even death; (e) believes it will not help him; (f) the doctors are trying different medications and that he cannot be on lithium; and (g) that he has the right to accept or refuse.

There is no evidence Waltz does not understand, and cannot knowingly and intelligently act upon every item specified in section 5326.2. ▉ The factor relied upon by the doctors in concluding he could not give informed consent was his psychotic, paranoid reaction to the discussion of ECT. This fear reaction is symptomatic of his illness. However, even in his nonpsychotic moments, including during his testimony, he understands ECT could cause memory loss and could kill him and fears these demonstrated side effects. In short, Waltz has both *a psychotic and a rational fear* of ECT. Section 5326.5, subdivision (d) makes it clear the mere fact Waltz has been diagnosed as having a mental illness is not enough to deem him incapable of consent. It follows that even though he has a mental illness which causes him to be paranoid about ECT and many other things, this fact alone cannot be used to negate the presence of a rational fear of ECT which causes him to refuse the treatment even during his nonpsychotic moments. It is not per se irrational to fear possibly irreversible memory loss, which is one of the required consent items in section 5326.2, nor is it per se irrational to fear death, even if its occurrence during ECT is rare.

▉ Finally, the trial court at the conclusion of the August 13 hearing relied on the belief that the use of ECT was a life or death matter implying no person capable of informed consent would refuse the treatment under those conditions. Since there is no evidence to support a conclusion that ECT was a life-or-death matter, the court's reliance on this factor was erroneous.

We note the facts here are in sharp contrast to those in *Conservatorship of Fadley, supra,* 159 Cal.App.3d 440, where this court found all evidence showed the patient could not knowingly and intelligently act upon the information given by her doctor regarding the therapy. The patient could not remember her doctor had just spoken to her about her need for the therapy, and insisted her mind was perfect. (*Id.,* at pp. 446-447.) Here,

Waltz remembered at the hearings that he had been given information about ECT, and his doctors admit he knows he is mentally ill.

■ Section 5325, subdivision (f) states: "Each person involuntarily detained for evaluation or treatment under provisions of this part, . . . shall have the following rights . . .:

". . . . . . . . . . . . . . . . . . . . .

"(f) To refuse convulsive treatment including, but not limited to, any electroconvulsive treatment, any treatment of the mental condition which depends on the induction of a convulsion by any means, and insulin coma treatment." Section 5326.7, which provides for ECT upon consent of a conservator if the patient cannot consent, expressly states its provisions are "Subject to the provisions of subdivision (f) of Section 5325." Section 5326.85 states: "No convulsive treatment shall be performed if the patient, whether admitted to the facility as a voluntary or involuntary patient, is deemed to be able to give informed consent and refuses to do so. The physician shall indicate in the treatment record that the treatment was refused despite the physician's advice and that he has explained to the patient the patient's responsibility for any untoward consequences of his refusal." Thus, the Legislature has unequivocally established a patient's right to refuse ECT, *even if his physician believes it is necessary.*[13]

■ The trial court was required to find "clear and convincing evidence" that Waltz lacked the capacity to consent to or refuse ECT.[14] (*Lillian F.* v. *Superior Court, supra,* 160 Cal.App.3d 314, 324.) In holding a higher standard than the "preponderance of the evidence" standard was required in ECT hearings, the court in *Lillian F.* recognized the issue involves "the right to elect or reject a treatment which itself can invade the constitutional right of privacy." (*Id.,* at p. 321.) *Lillian F.* concluded that although the state has "a profound interest in insuring appropriate treatment for the conservatee as well as access to such treatment even for those who by virtue of their illness are incapable of understanding the benefit of the treatment and giving consent to it, [i]t has an equal interest in insuring that such a serious and intrusive procedure is not forced on a conservatee who does not want it and who is simply in disagreement with his conservator and his

---

[13]Although it is not the role of the courts to second-guess the medical opinion of the patient's physician, it is our role to insure ECT is not being administered against a patient's will as a convenient method of control of an aggressive patient.

[14]The "clear and convincing" evidence standard requires the evidence be so clear as to leave no substantial doubt, sufficiently strong to command the unhesitating assent of every reasonable mind. (*Lillian F.* v. *Superior Court* (1984) 160 Cal.App.3d 314, 320 [206 Cal.Rptr. 603].) In contrast, the preponderance of the evidence standard simply requires a belief the existence of a fact is more probable than its nonexistence. (*Ibid.*)

physicians." (*Id.*, at p. 323.) Here, the evidence indicates a disagreement between Waltz, who believes the medications will make him better, and his physician, who believes the drugs have not been effective. This disagreement does not show Waltz's inability to give informed consent.

We cannot conclude there is any substantial evidence in support of a finding that the evidence clearly and convincingly showed Waltz could not give informed consent.

We reverse the judgments finding Waltz incapable of giving informed consent and affirm the judgment appointing a conservator to provide for his basic personal needs.[15]

Kremer, P. J., and Butler, J., concurred.

On May 30, 1986, the opinion was modified to read as printed above.

---

[15]The reversal comes too late for Waltz who has already received the treatments against his will. The proper procedure would have been for his counsel to have requested a stay of the lower court's order, as was issued in *Lillian F.* v. *Superior Court, supra,* 160 Cal.App.3d 314, 316-317.