Filed 9/15/16  P. v. Gambord CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FIFTH APPELLATE DISTRICT**

| | |
|---|---|
| THE PEOPLE, | F070669 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. 14CRAD682209) |
| JEFFREY GAMBORD, | **OPINION** |
| Defendant and Appellant. | |

**THE COURT**\*

APPEAL from an order of the Superior Court of Fresno County.  Jonathan B. Conklin, Judge.

Robert Navarro, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie Weng-Gutierrez, Assistant Attorney General, Niromi W. Pfeiffer, and Karli Eisenberg, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

\*        Before Gomes, Acting P.J., Detjen, J. and Franson, J.

Appellant Jeffrey Gambord, a sexually violent predator, appeals from a December 1, 2014, order authorizing the Department of State Hospitals (DSH) to involuntarily administer psychotropic medications to treat his bipolar disorder. We affirm.

**FACTS AND PROCEDURAL SUMMARY**

**The Petition**

On September 4, 2014, DSH petitioned the superior court for an order compelling involuntary treatment of Gambord with psychotropic medication pursuant to *In re Calhoun* (2004) 121 Cal.App.4th 1315. The petition alleged that Gambord was admitted to Coalinga State Hospital (CSH) on September 19, 2006, pursuant to Welfare and Institutions Code section 6604. The petition stated he was diagnosed with Bipolar I Disorder, Current Episode Manic, and was involuntarily administered psychotropic medication pursuant to an in-house panel determination conducted on April 10, 2014. The petition further alleged that Gambord had a history of noncompliance with taking psychotropic medication, continued to demonstrate a lack of insight into his mental illness and his need for psychotropic medication, was unable to reason and understand the gravity of his actions, and was incompetent to refuse medical treatment. Moreover, he presented a danger to others when not medicated with psychotropic medication, threatening staff and exposing himself to female staff. Finally, the petition alleged there were no less intrusive methods to render him non-dangerous than administration of psychotropic medication.

**The Hearing**

*Dr. Risley*

Dr. Dawn Risley, a psychiatrist at CSH, testified that Gambord was her patient and she saw him multiple times per day. She diagnosed him with "Bipolar I Disorder, most recent episode manic with psychotic features." He had an "[e]xpansive, elevated and irritable mood lasting greater than one week with pressured speech and a need to keep

2.

talking; racing thoughts; engaging in behavior that has the potential for dangerous consequences; easily distractibility, psychomotor agitation[;] [¶] … [¶] [f]light of ideas [; a]nd increase in goal-directed activity." When she discussed this diagnosis with him, he disagreed, stating he suffered only from anxiety. He minimized the criteria and could not see how bipolar symptoms related to him.

Dr. Risley testified that the normal treatment for Gambord's condition included a mood stabilizer paired with a second generation antipsychotic medication. She had discussed this treatment with Gambord; however, he believed he did not need either medication and said he would only take Klonopin, which according to Dr. Risley would not treat his illness. On many occasions, he stated he would stop taking his medications, and then he did. He said he would not take his medications if he went to court or jail. He said he would only agree to take medications if they were administered at subtherapeutic dosages.

Dr. Risley testified that Gambord was not currently taking any medication because Dr. Risley had no further court order. She stopped Gambord's lithium because a test demonstrated an electrical abnormality of his heart. She explained that all medications carry risks, but the benefits outweighed the risks for Gambord because he needed the medication. He was in an institution for the gravely mentally ill where treating disorders was the main concern. Gambord was able to understand the risks and benefits of a medication, but not as it pertained to him. He believed he was not mentally ill and did not need medication. But he was in fact very mentally ill. He did not have the ability to understand and evaluate whether to take his medication, and he lacked the capacity to make his own decisions regarding his medication treatment.

Gambord was transferred to another level of care because he made repeated calls to several senators and they wanted him to stop. He was placed on one-to-one care and his telephone privileges were taken away, except for approved numbers.

*Defense Evidence*

### Officer Rabaut

Police Officer Charles Rabaut testified that he worked at CSH for three and one-half years as the chief of police and three years as a supervising senior special investigator. Gambord had functioned as a confidential informant for him, providing information about crimes being committed, including those involving Mr. M. Apparently, a police report naming Gambord as a confidential informant was provided to one of the patients by an attorney and the report was later recovered inside CSH. As a result, Gambord's life was threatened and he was physically assaulting in the hallway. He was called a rat. Gambord continued to call Officer Rabaut and provide information for a few years. Gambord seemed normal, rational, and logical. Some employees were involved in the criminal activities he reported. He also expressed concern that CSH was mistreating patients. He tried contacting authorities and legislators because he wanted to prevent a particular person from being appointed as the director of CSH. In addition, he considered starting a concierge dry cleaning service for the employees at CSH, which Officer Rabaut thought was unusual.

### Gambord

Gambord testified that he had only two 15-minute encounters with Dr. Risley. She later explained to him that he was going to be forcibly medicated because he had been threatening people in Sacramento and they were afraid. She said he was a danger to them. He denied threatening any senators. She explained that he was bipolar and needed medication. He told her about his other problems, but she said they would not cause bipolar disorder. She accused him of not taking responsibility for his behavior and not having insight into what he was doing.

4.

When Gambord was taking lithium and other drugs, he suffered from many side effects. He would consider taking other medications if he could start with smaller doses and see if he had side effects.

Gambord did not believe he was bipolar, but he thought his anxiety would benefit from medication. He could speak calmly when given the time to explain himself. And when he did get excited, he could calm himself back down. Often the situations at CSH provoked excited behavior in patients. Sometimes he needed to show his anger to be taken seriously at CSH.

That morning, he asked to take an Ativan because he was nervous about the hearing. He testified that he was not allowed to take it because "they" wanted the court to see him in his "full manic state or something."

Gambord had written a critical report on CSH and posted it on his website. Dr. Risley told him his website was full of typical manic stuff. He told her he had received a lot of compliments about his website, but she said it was totally manic. She would not listen to the things he said about CSH and its crimes. Gambord started contacting legislators regarding what was happening at CSH. His first goal was to prevent the appointment of a particular administrator at CSH; the second was to initiate an investigation into deaths occurring at CSH.

He was also considering starting a concierge-type service for CSH employees that might include dry cleaning, expanded food service, and car detailing.

He once protested CSH's prohibition against video contact between patients and their terminally ill family members. He was granted approval to visit with his father via video.

Gambord informed Officer Rabaut that a patient, Mr. M, was going to stab another patient. Officer Rabaut sent the police. At trial, Officer Rabaut testified to protect Gambord's identity, and Mr. M. was convicted. But Mr. M. found the report and discovered Gambord's identity. Mr. M. then threatened Gambord, who had no choice but

5.

to negotiate with him. Gambord would buy him sodas and leave them in the bathroom where there were no cameras. Eventually, Gambord decided to stop. He told the director he was going to stop paying off Mr. M. and he expected the hospital to protect him. After that, he was threatened, assaulted, and called names. He was still housed with Mr. M. Gambord tried to keep to himself for his own safety.

On cross-examination, Gambord said he probably had several mental illnesses. He thought he might exhibit some of the symptoms of bipolar disorder, but he had not had the opportunity to explore it because Dr. Risley would not discuss it with him. He did think he had anxiety and post-traumatic stress disorder. He explained: "I may have bipolar. I just am not convinced. I'm open to the idea of somebody convincing me that there's not a differential diagnosis of anxiety versus bipolar, you know." He explained that he refused to take the prescribed medication because of side effects he was suffering, including weight gain, arrhythmias, high blood sugar, confusion, and dizziness.

After hearing this evidence and argument by counsel, the superior court granted the petition to forcibly medicate Gambord. The following occurred:

> "THE COURT: I've read and considered my notes. A couple observations. Mr. Gamboa [sic] is clearly bipolar. He's clearly manic. And I don't mean that as a criticism of you, sir. You've acknowledged it. You acknowledged you're bipolar. You know, sometimes when I'm conducting these hearings I listen for very telling quotes and testimony. And there's two of them that struck me. One of them—and I acknowledge that there may be some animosity between Dr. Risley and Mr. Gamboa [sic]. That was obvious from the testimony. I'm not stating that as a criticism, but there, obviously, is some—maybe some animosity between the two both ways. I'm not saying just from Mr. Gamboa [sic] to Dr. Risley, perhaps from Dr. Risley to Mr. Gamboa [sic] as well.

> "But one of her quotes was: His behavior is uncontrollable because he's manic. And then Mr. Gamboa [sic] stated in his testimony, and it was almost a passing conversation, where he said they didn't want to give me my meds this morning because they wanted the court to see what I'm like when I'm manic. Well, that's exactly the behavior that was displayed in court today.

"Um, so I agree with you, [defense counsel], Mr. Gamboa [sic] appears to be a highly intelligent man.

"[DEFENSE COUNSEL]: Excuse me. Gambord.

"THE COURT: Gambord. I apologize. Highly intelligent. But he's more than driven and he's more than passionate. That is what is of greatest concern of the court. Now, I'm trying to balance that concern against his medical well-being.

"While I'm going to order the forced med, I'm going to approve the order for lack of capacity, because I do not believe he has the capacity to make a rational decision about his medication. Um, I believe that that— any medication issues are—still have to be governed by appropriate medical treatment. So my order can in no way be read or heard to put Mr. Gambord at risk, if this—the—and I apologize. I forget the medical term for the heart condition.

"[DEFENSE COUNSEL]: QT—

"THE COURT: QTCs. If the QTCs occur, and it appears that Mr. Gambord is at medical risk, then I'm ordering that he be constantly monitored—his medical condition be constantly monitored. If at any time the medical risks do outweigh the benefits of the medication they are ordered to be ceased.

"I'm not a doctor. I don't believe any court has the ability to say continue this medication if it puts the defendant at risk. I've not heard testimony today that establishes he is at risk for continuing medication. The doctor stated, though it was—the question was stated in the negative so initially it was misstated, but she stated the benefits of the medication outweigh the risks. And that's what the evidence appears to establish today.

"It is, frankly, just striking to the court, and I think we all—because it's been previously established that Mr. Gambord has been off his medication now for some time.

"[DEFENSE COUNSEL]: Correct.

"THE COURT: And, um, he is surely no better. And it appears to this court, based upon observation, that his behavior is, um, continuing to deteriorate in the sense of the manic behavior and the bipolar symptoms, the—I tried to keep track of the criteria that the doctor utilized when she

7.

was listing the description of bipolar. And those behaviors were exhibited even in court today.

"So I am finding that the defendant lacks the appropriate capacity to make the decisions. And I'm approving the forced medication order."

On December 16, 2014, Gambord filed a notice of appeal.

## DISCUSSION

A competent adult has a common law and constitutional right to refuse medical treatment, including the administration of antipsychotic drugs. (*In re Qawi* (2004) 32 Cal.4th 1, 14.) An involuntarily committed patient may be forcibly treated with antipsychotic medication if a court has determined that he is not competent to refuse treatment. (*Ibid.*; *In re Calhoun, supra,* 121 Cal.App.4th at p. 1354.) The superior court shall determine competence to refuse treatment by clear and convincing evidence, "so clear as to leave no substantial doubt, [and] sufficiently strong to command the unhesitating assent of every reasonable mind." (*Conservatorship of Waltz* (1986) 180 Cal.App.3d 722, 733, fn. 14.)

A judicial determination of competency to refuse treatment involves consideration of three factors: (1) whether the patient is aware of his situation and acknowledges his condition; (2) whether he understands the benefits and risks of treatment as well as alternatives to treatment; and (3) whether he is able to understand and evaluate the information regarding informed consent and participate in the treatment decision by rational thought processes. (*Riese v. St. Mary's Hospital & Medical Center* (1987) 209 Cal.App.3d 1303, 1322-1323.)

The standard of review for an order authorizing the involuntary administration of antipsychotic medication is substantial evidence. (*People v. Fisher* (2009) 172 Cal.App.4th 1006, 1016.) "In considering a challenge to the sufficiency of the evidence … we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable,

8.

credible, and of solid value—from which a reasonable trier of fact could [make its findings]. [Citation.] We presume every fact in support of the [ruling that] the trier of fact could have reasonably deduced from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal … is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. [Citation.] 'A reviewing court neither reweighs evidence nor reevaluates a witness's credibility.' " (*People v. Albillar* (2010) 51 Cal.4th 47, 59-60.)

Here, while there was evidence that Gambord was articulate and intelligent, there was also evidence reasonably justifying the court's finding that he was manic and bipolar, not simply passionate and driven. Dr. Risley explained that he exhibited several bipolar symptoms, and the superior court stated it observed many of them during the hearing. Defendant was aware he struggled with mental illness, and he was willing to treat his anxiety, but he did not accept the bipolar diagnosis or his need for medication of that illness. He acknowledged his condition to only a limited extent, conceding he might have some bipolar symptoms, but he continued to deny the diagnosis and stated he would be willing to try medication only in subtherapeutic dosages. The evidence established he was not aware of his bipolar illness and his need for medication of that illness, and was not able to rationally participate in the treatment decision. Thus, we conclude the record contains substantial evidence supporting the superior court's finding that Gambord was not competent to refuse treatment. Furthermore, we defer to the superior court's ability to observe Gambord's behavior and gauge the witnesses' credibility, recognizing that without that ability, we are in no position to question the court's observations or reweigh the evidence before it.

**DISPOSITION**

The superior court's order is affirmed.