Filed 1/4/22  State Department of Hospitals v. A.A. CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| STATE DEPARTMENT OF STATE HOSPITALS, | F082909 |
| Plaintiff and Respondent, | (Super. Ct. No. 20CRAD685935) |
| v. | |
| A.A., | **OPINION** |
| Defendant and Appellant. | |

## THE COURT[*]

APPEAL from an order of the Superior Court of Fresno County.  Hilary A. Chittick, Judge.

Rudy Kraft, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Cheryl L. Feiner, Assistant Attorney General, Gregory D. Brown and Anthony C. Pinggera, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

[*]      Before Peña, Acting P. J., Smith, J. and Snauffer, J.

A.A. is a patient civilly committed under the Sexually Violent Predator Act (SVPA) (Welf. & Inst. Code, § 6600 et seq.), committed at the State Department of State Hospitals at Coalinga (DSH). DSH petitioned for an order compelling involuntary treatment of A.A. with psychotropic medication. That petition was granted and A.A. appeals.

On appeal, A.A.'s counsel has filed an opening brief requesting this court conduct an independent review pursuant to *People v. Wende* (1979) 25 Cal.3d 436 and *Anders v. California* (1967) 386 U.S. 738. In the alternative, A.A.'s counsel has outlined the applicable law pursuant to *Conservatorship of Ben C.* (2007) 40 Cal.4th 529 (*Ben C.*), and requested that we exercise our discretion to conduct an independent review.[1] The People contend that we are not compelled to review the matter pursuant to *Wende* and *Anders* and we should decline to review the matter pursuant to *Ben C.* We exercise our discretion to conduct an independent review. Finding that no reasonably arguable factual or legal issues exist, we dismiss A.A.'s appeal.

## PROCEDURAL SUMMARY

On June 5, 2009, A.A. was committed to DSH pursuant to Welfare and Institutions Code section 6600 et seq.

On December 16, 2020, DSH filed a petition to compel A.A. to submit to involuntary psychotropic medication pursuant to *In re Calhoun* (2004) 121 Cal.App.4th 1315.

The trial court conducted a hearing on the petition on March 15, 2021, April 26, 2021, and April 27, 2021. On April 27, 2021, the court concluded that A.A. did not "fully understand the risks … of stopping the medications." He was able to "evaluate some of the information [regarding his treatment], but … [was] not completely [able to]

---

[1] A.A. was notified of the nature of the brief filed by his appellate counsel and afforded an opportunity to file a supplemental brief. He filed no supplemental brief.

2.

evaluate the information that is provided and he participates in treatment decisions by means of thought processes that are not always completely rational." For those reasons, the court granted DSH's petition, ordering that A.A. be involuntarily administered antipsychotic medication.

On June 16, 2021, defendant filed a notice of appeal.

## FACTUAL SUMMARY

**Doctor Ma**

Doctor Charles Ma was a psychiatrist at DSH. Ma was A.A.'s primary treating psychiatrist and had worked with A.A. since July 2020. A.A. is diagnosed with bipolar I disorder. Bipolar I disorder is characterized by episodes of mania for a period of at least one week, alternating with periods of depression with depressive symptoms that last at least two weeks. In his manic periods, A.A. has exhibited hyperactivity with increased motor activity, a decreased need for sleep, irritability and anger, psychotic features where A.A.'s thoughts became loose and disorganized, and hypersexuality. On one occasion, DSH staff also reported that A.A. experienced some visual and auditory hallucinations where he appeared to be interacting with someone not present.

Ma met with A.A. an average of two to three times per month. During those meetings, Ma discussed A.A.'s medication regimen with A.A. multiples times. A.A. often gave input regarding the medications he would like to be prescribed. A.A. occasionally had some insight into his symptoms, but other times he denied having any mental illness or needing medications. Ma opined that because of his limited awareness of his symptoms, A.A. was unable to understand the benefits and risks of taking or not taking medication. For that reason, Ma opined that A.A. was unable to give knowing and intelligent informed consent to take medication.

Ma provided examples of A.A.'s insight and lack of insight. In August 2020, A.A. told Ma that he did not believe he had a mental illness, despite showing symptoms of mental illness including irritability, anger, entering the personal space of females, and

3.

kicking the nurse's station door. At that time, A.A. did not recognize anger as one of the symptoms of his mental illness. On December 3, 2020, A.A. displayed some insight into his symptoms. He was able to list some of the symptoms of his mental illness such as "feeling more sexual [and] becoming more angry with people …." On that date, he also requested to be placed on an additional medication. However, at that time, he did not recognize other symptoms of his mental illness such as holding the belief that God told him to win the lottery so he could "win the affections of a half Philippina, half African-American female that is [five] feet 11 [inches] to [six] feet tall."[2]

At the time of the hearing, A.A. was on an involuntary medication order, imposed by DSH medical panels on August 11, 2020, and August 25, 2020. He had also previously been ordered to involuntarily take medication. Prior to the involuntary medication order in place at the time of the hearing, A.A. had stopped taking his prescribed medications on three occasions—in March 2020, on May 13, 2020, and on June 22, 2020. On August 7, 2020, DSH staff heard A.A. tell a peer that he made himself regurgitate after he took his medications. On November 12, 2020, DSH staff observed A.A. attempt to avoid taking his medication by "cheek[ing]" his medication, i.e., pretending to swallow a pill but keeping it in his mouth. On November 16, 2020, Ma ordered A.A.'s medication crushed. On November 18, 2020, defendant was observed attempting to regurgitate his medication. He admitted to DSH staff that he was attempting to regurgitate his medication.

At the time of the hearing, Ma had prescribed A.A. the lowest dosage of medications that was still sufficient to manage his symptoms. Ma believed that A.A. was taking the prescribed medications. Ma observed that once the medication took effect, A.A.'s anger and irritability started to decrease, the encroachment of personal space upon

---

**2**      During Ma's testimony, A.A. interrupted Ma to "object[] to [Ma's characterization of his statement] because [A.A.] didn't tell [Ma] God told [him] to win the lotto. … [Instead,] God was letting [A.A.] know how to go about doing it."

female employees "mostly resolved," and the hypersexuality decreased. By December 2020 and January 2021, Ma noticed significant improvements in A.A.'s behavior. A.A. also noticed that the medications helped reduce his hypersexuality and anger. Ma testified that A.A. generally did better when he was taking his medications.

Ma opined that if A.A. were not on an involuntary medication order, he would not take his medication. On March 3, 2021, one of A.A.'s medications had worn off and he again began to show symptoms of anger and irritability toward DSH staff. Ma met with A.A. and Ma told him that he would like to start A.A. on a low dose of a different medication. A.A. responded that he did not hear voices or see things. He believed that Ma was prescribing him medication for no reason. A.A. became upset and left the meeting. Ma opined that A.A. did not recognize the symptoms of his mental disease and was unlikely to take medication voluntarily.

After March 3, 2021, A.A. met with Ma several times but declined to speak with Ma about his medications until April 22, 2021. On April 22, A.A. again expressed that he did not need to take all of his medications. Ma explained that defendant's desire not to take his medications reflected that he did not understand the symptoms of his mental illness.

**Guadalupe McKenzie**

Guadalupe McKenzie was a nurse and the unit supervisor of A.A.'s unit at DSH. She had worked with A.A. for approximately six years.

McKenzie testified that in the last year, A.A. had encroached upon her personal space. She also observed A.A. make inappropriate sexual gestures toward female staff at DSH. For instance, at least 10 times in several months prior to McKenzie's testimony, A.A. approached female staff members with his arms up as though he was going to hug them. On August 6, 2020, prior to A.A.'s involuntary medication order, McKenzie encouraged A.A. to take his medications. He explained that he did not need them because he did not hear voices. He then became very irritable, began yelling, and

5.

encroached upon her personal space. She attempted to redirect A.A. but he would not move away. She activated her personal alarm because he was becoming aggressive and she was afraid for her safety.

## DISCUSSION

As noted, A.A.'s counsel has filed a brief identifying no reasonably arguable issues on appeal. A.A.'s appellate counsel recognizes that *Wende/Anders* treatment—requiring independent appellate court review of a record for the existence of meritorious issues—applies only to a criminal defendant's first appeal of right from a criminal conviction. (See *People v. Martinez* (2016) 246 Cal.App.4th 1226, 1230.) California courts have not extended that treatment to an "appeal from the establishment of a conservatorship [citation], from the denial of a petition for outpatient treatment of an [individual found not guilty by reason of insanity] [citation], … from an order committing an individual as a mentally disordered offender," or from an order extending the commitment of a person found not guilty by reason of insanity. (*Ibid.*) *Wende/Anders* review is not compelled here.

Nevertheless, we have exercised our discretion to proceed with this appeal and review the record consistent with the standards set forth in *Ben C.* and *People v. Serrano* (2012) 211 Cal.App.4th 496, 503–504. As the court in *Ben C.* described in the context of a conservatorship appeal, when appointed appellate counsel finds no arguable issues, "counsel need not and should not file a motion to withdraw. Instead, counsel should (1) inform the court he or she has found no arguable issues to be pursued on appeal; and (2) file a brief setting out the applicable facts and the law. Such a brief will provide an adequate basis for the court to dismiss the appeal on its own motion." (*Ben C.*, *supra*, 40 Cal.4th at p. 544.)

Here, A.A.'s counsel has filed a brief outlining the applicable law regarding (1) the sufficiency of evidence to support a forced medication order and (2) admission of otherwise inadmissible case-specific hearsay testimony that served as the basis of an

6.

expert witness's testimony (See *People v. Sanchez* (2016) 63 Cal.4th 665 (*Sanchez*)).  We briefly summarize both issues and explain why neither provides a basis for relief in this case.

First, a competent adult has a common law and constitutional right to refuse medical treatment, including the administration of antipsychotic drugs.  (*In re Qawi* (2004) 32 Cal.4th 1, 14.)  An involuntarily committed patient may be forcibly treated with antipsychotic medication if a court has determined that he is not competent to refuse treatment.  (*Ibid.*; *In re Calhoun*, *supra*, 121 Cal.App.4th at p. 1354.)  The superior court shall determine competence to refuse treatment by clear and convincing evidence, "so clear as to leave no substantial doubt, [and] sufficiently strong to command the unhesitating assent of every reasonable mind."  (*Conservatorship of Waltz* (1986) 180 Cal.App.3d 722, 733, fn. 14.)

After independent review of the record on this issue, we find that no reasonably arguable factual or legal basis to challenge the sufficiency of the evidence exists.  Ma testified that A.A. suffered from bipolar I disorder, causing periods of mania and periods of depression.  In A.A.'s manic periods, he exhibited hyperactivity, irritability and anger, psychotic features where A.A.'s thoughts became loose and disorganized, and hypersexuality.  A.A.'s symptoms were at least partially controlled by medication.  However, even when medicated, A.A. was not able to fully understand his symptoms and he had limited insight into how his medications helped to control his symptoms.  For that reason, Ma opined that A.A. was unable to give intelligent, informed consent regarding his medication regimen.

Sufficient evidence supported the trial court's conclusion that A.A. was not competent to refuse treatment.

Second, A.A.'s counsel suggests that Ma testified to some case-specific hearsay but does not identify any specific statements.  We find no error.

In *Sanchez*, our Supreme Court held, "[w]hen any expert relates to the jury

7.

case-specific out-of-court statements, and treats the content of those statements as true and accurate to support the expert's opinion, the statements are hearsay." (*Sanchez*, *supra*, 63 Cal.4th at p. 686.) Our Supreme Court drew a distinction between "an expert's testimony regarding his general knowledge in his field of expertise," and "case-specific facts about which the expert has no independent knowledge." (*Id*. at p. 676, italics omitted.) The former is not barred by the hearsay rule, even if it is "technically hearsay," while the latter is. (*Ibid*.) An expert is generally not permitted to supply case-specific facts about which he or she has no knowledge. (*Ibid*.)

Ma's testimony included some matters of which he had no personal knowledge. For instance, Ma testified that A.A. would occasionally "cheek" medication but Ma did not distribute A.A.'s medication. Ma also testified regarding A.A.'s refusal to meet with him, but the message was relayed to Ma by a "tele-psychiatry coordinator" and DSH staff. However, A.A.'s history of medication refusal (and potentially violent escalation) was testified to by McKenzie. And Ma testified that A.A. refused to discuss medications with him and terminated their meetings several times because of A.A.'s feelings toward the medications Ma prescribed him. Therefore, Ma did not operate as a conduit for otherwise inadmissible hearsay and any conceivable error was harmless.[3] (*People v. Calhoun* (2019) 38 Cal.App.5th 275, 319 ["Any conceivable *Sanchez* error was harmless because the content of the [hearsay] was independently proven" through admissible evidence].)

---

[3] Even assuming the description of A.A.'s refusal to meet with Ma was erroneously admitted and it was not otherwise independently properly admitted, that testimony was cumulative of the other evidence that A.A. refused to speak to Ma and walked out of their meetings. It was not material to any contested issue. Any error was therefore harmless under any standard because it did not contribute to the trial court's conclusion. (*People v. Bell* (2020) 47 Cal.App.5th 153, 196–197 [applying the harmless beyond a reasonable doubt standard to *Sanchez* error in reviewing a direct appeal of a criminal conviction].)

## DISPOSITION

A.A.'s appeal is dismissed.