Filed 2/17/26  State Dept. of State Hospitals v. A.A. CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| STATE DEPARTMENT OF STATE HOSPITALS, | F089613 |
| Plaintiff and Respondent, | (Super. Ct. No. 24CRAD687526) |
| v. | |
| A.A., | **OPINION** |
| Defendant and Appellant. | |

## THE COURT[*]

APPEAL from a judgment of the Superior Court of Fresno County.  Irene A. Luna, Judge.

Linda J. Zachritz, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Cheryl L. Feiner, Assistant Attorney General, Benjamin G. Diehl and Katherine Sims, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

[*]      Before Meehan, Acting P. J., Snauffer, J. and DeSantos, J.

Defendant A.A. contends on appeal that the trial court's order pursuant to *In re Calhoun* (2004) 121 Cal.App.4th 1315 granting the State Department of State Hospitals (DSH)'s petition to compel administration of antipsychotic medication (IMO) must be reversed because there is insufficient evidence that he lacked competence to rationally participate in the treatment decision. DSH disagrees. We affirm. Further, because the parties have both stipulated to the issuance of an immediate remittitur, the remittitur shall issue immediately.

## PROCEDURAL SUMMARY

On or about May 21, 2009, defendant was admitted to DSH at Coalinga (DHS-Coalinga), pursuant to a Welfare and Institutions Code section 6602, subdivision (a) probable cause finding that he was a sexually violent predator (SVP).

Since October 30, 2023, DHS-Coalinga has involuntarily administered defendant with prescribed antipsychotic medication, pursuant to an IMO.

On October 2, 2024, DSH filed a petition for renewal of the IMO.

On March 21, 2025, the trial court found defendant lacked the capacity to refuse treatment and granted the petition.[1]

On April 7, 2025, defendant filed a notice of appeal.

## FACTS

### Dr. Reantaso's Testimony

On March 21, 2025, at the hearing on DSH's IMO petition, Dr. Antonio Reantaso, a psychiatrist, testified as an expert witness for DSH. Reantaso had been defendant's treating psychiatrist at DSH-Coalinga since approximately 2023. Reantaso testified that he reviewed his notes and evaluated defendant prior to the hearing.

Reantaso stated defendant was diagnosed with "[b]ipolar disorder type one with psychotic features," exhibiting symptoms including "depressive symptoms such as

---

[1]     The IMO order expires March 21, 2026.

2.

feeling sad, feeling hopeless with exacerbation of his cognitive difficulties, sleep disturbance, sense of hopelessness, and also … manic episodes in which he becomes hyper excitable, easily agitated, very irritable, and expresses delusions of grandeur such as having a baby with celebrities and having supernatural powers." He stated, however, that he believed defendant "is well controlled with medications." He testified that defendant was currently prescribed a regimen of "a long-acting, injectable, paliperidone palmitate" called Invega Sustenna, as well as Risperdal, a low dose of Quetiapine or Seroquel, and a mood stabilizer called Valproic acid.

Reantaso testified that defendant responded "[v]ery well" to the medications, and that there were no other viable options for treating defendant's mental illness. However, Reantaso stated that defendant had a history of refusing medication.

Reantaso testified that when defendant was asked if he was aware of his mental illness, defendant was able to "regurgitate the name of the condition, but when asked to elaborate on what he thinks that condition means, he also is able to report … voices, impulsivity … and he will at times not understand why he's taking medications and will almost demand that I discontinue the medications, and I just let him know that I am under a court order to treat him."

Reantaso testified, when asked if he believed defendant understood the benefits and risks of treatment, "[I]n one conversation he said that he is not fighting as much anymore so that he is noticed. But that sort of—he is—the main symptom that he has, he believes that he has impulsivity, and that causes him to get into fights. And so a fairly limited ability to express to me the benefits that he's obtaining from the medication regimen."

When asked whether defendant had the capacity to make decisions regarding the administration of antipsychotic medications, Reantaso testified, "I think now because he is treated, there's very limited capacity. It's unfortunate that that is the one aspect of bipolar disorder that he has that medicines are not resolving. So, yeah, for the most part,

3.

the level of insight into his illness and the need to take medications remains stable, has been inconsistent and sometimes contradictory."

Reantaso testified that he did not believe defendant would continue to take the required dosage without the IMO, stating,

> "He will do that, but then two days later, he will come in and … say, 'You're giving me too much.'
>
> Then I would offer him a blood level to work with him to see if it is too much or not. And he will become upset over that, stating that I will just use the results against him. He has, on many occasions, has said that he doesn't need *Calhoun*. I don't want the *Calhoun*. And again when you ask him, he said that he will take his medications, but in my review of the records, he has demonstrated that when the medications were either discontinued through courts or through—when there was no IMO, these are the times when he demonstrated the dangerousness and lack of capacity."

On cross-examination, Reantaso testified that he recorded in his treatment notes on December 12, 2024, that defendant had been doing well that month, without any behavioral issues or issues complying with his medication orders. Reantaso believed the last time defendant discussed having supernatural powers or relations with celebrities was in 2020.

On redirect examination, Reantaso stated,

> "[Defendant] does legally believe he has a right to stop his medication. Unfortunately, this is when he will decompensate aggression and other psychotic symptoms such as mood, fear that the doctors are trying to harm him with their medications. There's always attempts to get them to resume medications on a voluntary basis, and we will at times say, you know, your behavior is such that you put us in a position where we might have to re-petition, but he doesn't hide these types of recommendations. So we end up having to—I remember one specifically when his IMO was not upheld, he quit his medications that very same day. And then within [a] two to four-week period, he decompensated to the point that we need[ed] to re-petition again."

Reantaso stated that when he asked defendant, "[W]hat do you think will happen when you are off medications?" defendant said nothing would happen, which caused

Reantaso to believe defendant lacked appreciation of the benefits of the medication. He stated the benefits of antipsychotic medication for defendant included mood stabilization, including preventing depressive episodes where defendant expressed sadness, fearfulness, and helplessness, and preventing psychotic episodes where he believed people were trying to kill him.

Reantaso testified the remaining symptom for defendant despite the medication was anosognosia, which meant defendant lacked true insight into the fact that he had a mental illness, causing defendant to believe he did not need to take medication. He testified that, given defendant's history of refusing medication and his lingering symptom of anosognosia, it was his opinion that defendant would not take medication without the IMO.

On recross-examination, Reantaso stated defendant's mental stability was a direct result of his medication compliance. He testified defendant had been "100 percent compliant" in taking his medications during the year he had treated him, but that he had not been consistent in "saying that he will take his medications." He stated defendant told him he did not need a court order to continue taking his medications and that the IMO makes him "feel controlled" and that he had asked for his medication dosage to be decreased on February 6, 2025.

### *Defendant's Testimony*

Defendant also testified. He stated that he took his prescribed medications because without it, he would not "be too steady."

He testified that the last time he stopped taking his medication after his IMO was not renewed was because, at that time, he had a different doctor that was "an a[******] doctor … jacking up my med[ication]s for nothing." He stated he preferred Reantaso, "except when I go and tell what the doctor say, I go in there and start talking, and he'd be listening, then all of a sudden, he'd be like, uh, so how about … let's go and check your blood and see where your medication's at and things like that.… And I'm trying to get a

5.

deduction on my medication because … I'm trying to do something, and the medication ain't letting me … what's the word? I'm … having a problem defining words.… [¶] … [¶] But, yeah, and he against me like that."

He stated that he wanted to be on medication, however, because it "really helped" him and that he was doing well, and that he knew that to continue doing well, he needed to keep taking his medications and cooperating with Reantaso.

He stated he did not believe Reantaso understood his mental illness.

When asked whether he would stop taking his medication if the IMO were not renewed, defendant stated,

> "No, because I see I need my medication. The only thing that will make me … stop taking medication is if I went to a doctor that—like the last doctor I had in [20]18, he [was] always switching my meds and doing this and that and pulling me in to see him at [a] certain time and always f[***]ing with me. [¶] … [¶] I say, okay, I'm not going to take meds because he always want[ed] to mess with me and do all this and that. And then I'll go ahead and take down the line. The dude won't leave me alone. But, [Reantaso], he ain't like that, and I'll go ahead [and] take my meds until something's happening with me, with taking medication. I can go see [Reantaso] about it, you know."

## DISCUSSION

Defendant contends there is insufficient evidence to support the trial court's order renewing his IMO because he lacked competence to rationally participate in the treatment decision. DSH disagrees. We agree with DSH.

On March 31, 2025, the trial court granted DSH's petition to renew defendant's IMO, pursuant to *Calhoun*, after hearing expert testimony from Reantaso and defendant, stating,

> "[Reantaso] testified that [defendant's awareness of his mental illness] fluctuates or [defendant's] understanding fluctuates in mood and clarity of thought and at times not understanding why he's taking medications, and almost to quote him, [']demand that I discontinue the medication order.['] … He has told me he does not have a mental

6.

illness.…  He did say [defendant] … has a fairly limited ability to express to him the benefits of the medication.

"[Reantaso] opined that [defendant] is not able to rationally participate in the medication administration decision.  As to whether or not [defendant] has capacity to make decisions about his medication, [Reantaso] did testify that it is a limited capacity, that [defendant] lacks insight as to his need to take medications, and that it is inconsistent and sometimes contradictory.  [¶]  …  [¶]

"During periods when [defendant] is not under a medication order, which we have seen, this is when he decompensates with aggression.  And that previously when the involuntary medication order was not upheld, [defendant] quit his medications that day, and within a two to four-week period, he decompensated which led to a new petition.…

"[Reantaso] testified that [defendant] believes that there would be no changes, and that this shows a lack of appreciation of the benefit of the medication.

"And as to the remaining problematic symptom that [defendant] has given that the current medication had reduced most of his symptoms, [Reantaso] did opine that [defendant] lacks true insight.

"In weighing the testimony [of] both [Reantaso's] credibility and [defendant's] credibility, the Court does find that it is in conflict with—that [Reantaso] is more credible.  Petitioner has met the burden today and shown by clear and convincing evidence that [defendant] is not sufficiently aware of his condition.  He does not sufficiently understand the benefits, risks, and/or alternatives to treatment, and he is not sufficiently able to understand and evaluate the information that is required to be given to patients whose consent is sought.  Therefore, he cannot participate in the treatment decision in a rational process."

***B.    Law***

A competent adult has a right to refuse medical treatment, including antipsychotic drugs.  (*In re Qawi* (2005) 32 Cal.4th 1, 14, 15.)  However, that right is limited by countervailing state interests and is not absolute.  (*Ibid*.)  In nonemergency situations, a patient committed pursuant to the SVP Act can be compelled to be treated with antipsychotic medication, if a court determines that the SVP patient either (1) is incompetent to refuse antipsychotic medication; or (2) is a danger to others within the

meaning of Welfare and Institutions Code section 5300. (*In re Calhoun*, *supra*, 121 Cal.App.4th at p. 1354.)

A person involuntarily confined may not be found incapable of refusing a proposed therapy " 'solely by virtue of being diagnosed as mentally ill, disordered, abnormal, or mentally defective.' " (*Riese v. St. Mary's Hospital & Medical Center* (1987) 209 Cal.App.3d 1303, 1315 (*Riese*), superseded by statute as stated in *People v. Lewis* (2025) 111 Cal.App.5th 1078, 1102–1104.) When determining whether a patient is competent to consent to treatment with antipsychotic drugs, a trial court considers whether the patient is (1) aware of their situation; (2) able to understand the benefits and risks of, and the alternatives to, the proposed intervention; and (3) "able to understand and to knowingly and intelligently evaluate the information required to be given patients whose informed consent is sought ([Welf. & Inst. Code, ]§ 5326.2) and otherwise participate in the treatment decision by means of rational thought processes." (*Riese*, at pp. 1322–1323.) A competency determination "should focus primarily upon" these factors. (*Id*. at p. 1322.)

To order forced medication, the trial court must find a patient not competent to refuse treatment by clear and convincing evidence. (*Conservatorship of Waltz* (1986) 180 Cal.App.3d 722, 733, fn. 14.) The evidence must be such that the trier of fact could find it "highly probable" that whatever particular fact is in question is true. (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1011.)

We review an order authorizing the involuntary administration of antipsychotic medication for substantial evidence. (*People v. Fisher* (2009) 172 Cal.App.4th 1006, 1016.) "Substantial evidence is evidence that is 'of ponderable legal significance,' 'reasonable in nature, credible, and of solid value.' " (*Conservatorship of O.B.*, *supra*, 9 Cal.5th 989 at p. 1006.) We "must view the record in the light most favorable to the prevailing party below and give appropriate deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn

reasonable inferences from the evidence." (*Id*. at pp. 1011–1012.) The "sole inquiry is 'whether, on the entire record, there is *any* substantial evidence, contradicted or uncontradicted,' supporting the court's finding." (*Sabbah v. Sabbah* (2007) 151 Cal.App.4th 818, 822.)

### A. Analysis

Here, there is sufficient evidence to support the trial court's order pursuant to *Calhoun* renewing defendant's IMO because he lacked the competence to rationally participate in the treatment decision.

Defendant first argues there is insufficient evidence that he "is incompetent to understand the benefits and risks of the medication and is incompetent to rationally participate in the treatment decision." He contends "that the weight of the evidence was that [defendant] wanted to work with [Reantaso], and take medication that was working for him at the time of the hearing." He argues that he "clearly expressed his willingness to desire to cooperate with medication that helps him."

DSH argues, however, that defendant was not competent to understand the benefits and risks of the medication and was not competent to rationally participate in the treatment decision, as the evidence was sufficient to show he was not aware of his situation, was not able to understand the benefits and risks of, or alternatives to, the proposed medical treatment, and was not able to understand and knowingly and intelligently evaluate and participate in the treatment process. It contends "[defendant]'s testimony demonstrated his lack of understanding or cooperation with changes in his medication regimen, which manifests in distrust or dislike of his doctor," and his lack of understanding that medication may need to be altered or increased for more beneficial effects. DSH argues this was demonstrated by defendant's own testimony that he stopped taking his medication immediately upon the removal of his prior IMO because he stated he believed his previous doctor "was an a[******] doctor, and he wasn't no good."

9.

Here, there is sufficient evidence to support the trial court's finding of clear and convincing evidence that defendant lacked competence to refuse antipsychotic medication because he (1) was not aware of his situation; (2) was not able to understand the benefits and risks of, and the alternatives to, the proposed intervention; and (3) was not "able to understand and to knowingly and intelligently evaluate the information required to be given patients whose informed consent is sought ([Welf. & Inst. Code, ]§ 5236.2) and otherwise participate in the treatment decision by means of rational thought processes." (See *Riese, supra*, 209 Cal.App.3d at pp. 1322–1323.)

First, the evidence supports the trial court's reasonable inference that defendant was not truly aware of his situation. Reantaso testified that while defendant could regurgitate his diagnosis when asked and stated that the medication helped him with symptoms such as fighting and impulsivity, he still suffered from the symptom of anosognosia even when taking the prescribed medications. Reantaso opined defendant's anosognosia resulted in a lack of true insight into the fact that he had a mental illness, causing him to believe he did not need to take medication and that nothing would happen if he were to stop taking it.

The evidence was also sufficient to support the trial court's reasonable inference that defendant was not able to understand the benefits and risks of, and the alternatives to, the proposed intervention. Reantaso testified that defendant believed nothing would happen if he were to stop taking the medication as prescribed and had recently asked for a decrease in dosage of the medication. Defendant had stopped taking his medications immediately the last time his previous IMO had not been renewed, causing him to rapidly decompensate. Further, defendant testified that if the IMO was not renewed, he would only continue taking his medication "until something's happening with me, with taking medication."

Last, the evidence is sufficient to support the trial court's reasonable inference that defendant was not "able to understand and to knowingly and intelligently evaluate the

10.

information required to be given patients whose informed consent is sought … and otherwise participate in the treatment decision by means of rational thought processes," as he continued to suffer from the symptom of anosognosia despite taking the prescribed medication, and continued to believe that nothing would happen if he were to stop taking it, despite knowing that when he stopped taking it when the previous IMO was not renewed, he suffered rapid decompensation. (See *Riese*, *supra*, 209 Cal.App.3d at pp. 1322–1323). The evidence, including Reantaso's testimony that defendant suffers from anosognosia despite medication, establishes a clear link between defendant's mental illness and his ultimate decision as to treatment. (See *Riese*, at p. 1323.)

Further, the trial court noted it found Reantaso's testimony to be credible. "Resolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact." (*People v. Young* (2005) 34 Cal.4th 1149, 1181.) "Moreover, unless the testimony is physically impossible or inherently improbable, testimony of a single witness is sufficient to support a conviction." (*Ibid*.) "We neither reweigh the evidence nor reevaluate the credibility of witnesses." (*People v. Jennings* (2010) 50 Cal.4th 616, 638–639.) Accordingly, as Reantaso's testimony was neither physically impossible nor inherently improbable, the court was entitled to find his testimony credible when resolving conflicts in the evidence.

Defendant also contends that the trial court ignored Reantaso's testimony that defendant was "currently doing well with medication compliance and the med[ication]s are working well for him." However, regardless of whether the medications were working well for defendant at the time of the hearing, the issue before the court was whether defendant was competent to refuse his antipsychotic medication if he was not subject to an IMO. Here, the evidence is sufficient to support the court's reasonable inference that, despite defendant "doing well" with medication compliance and that the medications were working for him at the time of the hearing, he lacked competence to refuse his medications, as he still suffered from the symptom of anosognosia, causing

11.

him to believe that quitting his medications would have no effect, and in light of his history of refusing his medication immediately after his previous IMO was not renewed, causing him to rapidly decompensate.

Here, as we do not reweigh the evidence and reevaluate the credibility of the witnesses, there is sufficient evidence to support the trial court's finding that defendant lacked competence to understand the benefits and risks of the medication and rationally participate in the treatment decision. Accordingly, there is sufficient evidence to support the court's order granting DSH's petition to renew the IMO. (See *People v. Jennings*, *supra*, 50 Cal.4th at pp. 638–639.)

Accordingly, we conclude there is sufficient evidence to support the trial court's order renewing the IMO and its finding of clear and convincing evidence that defendant lacked competence to participate in his treatment decisions.

As a final matter, because the parties have both stipulated to the issuance of an immediate remittitur, the remittitur shall issue immediately.

## **DISPOSITION**

The trial court's order is affirmed. Remittitur shall issue immediately.